Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARMANDO MARMOLEJO-CAMPOS, aka
Campos Ramos Armando,
               *Petitioner,*

       v.

ERIC H. HOLDER, JR., Attorney
General,*

               *Respondent.*

No. 04-76644

Agency No.
A71-616-204

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 23, 2008—Pasadena, California

Filed March 4, 2009

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Diarmuid F. O'Scannlain, Andrew J. Kleinfeld,
Barry G. Silverman, Raymond C. Fisher, Richard A. Paez,
Marsha S. Berzon, Richard C. Tallman, Richard R. Clifton,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Bybee;
Dissent by Judge Berzon

---

   *Eric H. Holder, Jr. is substituted for his predecessor, Michael B.
Mukasey, as Attorney General. Fed. R. App. P. 43(c)(2).

---

**COUNSEL**

Christopher J. Stender, Esq., Stender & Pope, P.C., San Diego, California, argued the cause for the petitioner and filed a brief.

Surrell Brady, Trial Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, DC, argued the cause for the respondent and filed a brief; Bryan S. Beier, Senior Litigation Counsel, Donald E. Keener, Deputy Director, Office of Immigration Litigation, and Jeffrey S. Bucholtz, Acting Assistant Attorney General, Civil Division, were on the brief; Edward C. Durant, Attorney, Office of Immigration Litigation, also filed a brief; Linda S. Wendtland, Assistant Director, Office of Immigration Litigation, and Peter D. Keisler, Assistant Attorney General, Civil Division, were on the brief.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We are called upon to decide whether an alien may be removed from the United States for having been convicted of

a crime involving moral turpitude as determined under federal immigration law.

I

A

Petitioner Armando Marmolejo-Campos, a native and citizen of Mexico, entered the United States without inspection near Nogales, Arizona, sometime in 1983. In 1990, he was convicted of felony theft in violation of Arizona Revised Statutes section 13-1802, and was sentenced to two months imprisonment. Years later, Campos was pulled over while driving in Maricopa County, Arizona, and charged with aggravated driving under the influence ("DUI"), in violation of Arizona Revised Statutes section 28-1383(A)(1).[1] Under that statute, a person is guilty of an aggravated DUI if he "driv[es]" or takes "actual physical control" of a vehicle "while under the influence of intoxicating liquor or drugs" *and* "while the person's driver license or privilege to drive is suspended, canceled, revoked or refused or while a restriction is placed on the person's driver license or privilege to drive as a result of [a prior DUI-related conviction]." *Id.*[2]

---

[1]At the time of Campos's conviction, Arizona's aggravated DUI statute was codified at Arizona Revised Statutes section 28-697. Five months later, Arizona redesignated the statute as Arizona Revised Statutes section 28-1383. 1996 Ariz. Sess. Laws, ch. 76, §§ 3, 25, *as amended by* 1997 Ariz. Sess. Laws, ch. 1, § 108 (effective Oct. 1, 1997); 1997 Ariz. Sess. Laws, ch. 220, § 82. For purposes of this opinion, we refer to the aggravated DUI statute by its current designation, section 28-1383.

[2]The statute provides in pertinent part:

A. A person is guilty of aggravated driving or actual physical control while under the influence of intoxicating liquor or drugs if the person does any of the following:

1. Commits a violation of § 28-1381 [(driving under the influence)], § 28-1382 [(driving under the extreme influence)] or this section while the person's driver license or privilege to drive is suspended, canceled, revoked or refused or while a restriction is placed on the person's driver license or privilege to drive as a result of violating § 28-1381 or 28-1382 or under § 28-1385 [(administrative license suspension for driving under the influence)].

In 1997, Campos pled guilty to committing such offense and, in so doing, admitted that he was driving on the day in question, that his blood alcohol content upon arrest was .164, and that he did not have a valid driver's license at the time. Campos was sentenced to four months in prison and three years probation as a result of this conviction.

The Immigration and Naturalization Service ("INS") subsequently placed Campos in removal proceedings, but he successfully petitioned for a waiver of inadmissibility and an adjustment of status to that of a lawful permanent resident, which he received in 2001. One year later, Campos pled guilty to violating Arizona's aggravated DUI statute for a second time, after he was again pulled over in Maricopa County for running a red light while intoxicated. At Campos's plea hearing, he admitted that he ran the red light, that his blood alcohol content upon arrest was .233, and that he knew at the time he was driving that his license had been suspended or revoked. Campos was sentenced to two and a half years in prison as a result of this second offense.

B

After his second aggravated DUI conviction, the Department of Homeland Security ("DHS"), the successor to the INS,[3] reinstituted removal proceedings against Campos, charging that he was removable under the Immigration and Naturalization Act ("INA") as an alien convicted of "a crime involving moral turpitude" within ten years of admission, *see* 8 U.S.C. § 1227(a)(2)(A)(i), and as an alien convicted of "two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct," *see id.* § 1227(a)(2)(A)(ii).

Campos filed a motion to terminate the proceedings, argu-

---

[3]On March 1, 2003, the INS ceased to exist as an agency under the U.S. Department of Justice and its functions were transferred to the Bureau of Immigration and Customs Enforcement within the newly formed DHS.

ing that his aggravated DUI convictions were not crimes of moral turpitude. An Immigration Judge ("IJ") held otherwise and ordered him removed to Mexico.[4]

## C

The Board of Immigration Appeals ("BIA" or the "Board") affirmed the IJ's decision in an unpublished order signed by a single member of the Board. That order relied on the BIA's en banc precedent, *In re Lopez-Meza*, 22 I. & N. Dec. 1188 (B.I.A. 1999), which held that a violation of Arizona's aggravated DUI statute is a crime involving moral turpitude. In *Hernandez-Martinez v. Ashcroft*, 329 F.3d 1117 (9th Cir. 2003), we considered *Lopez-Meza* and rejected the Board's interpretation of the Arizona statute. Although we did not opine on the Board's conclusion that the act of driving under the influence with a suspended or otherwise restricted driver's license is a crime involving moral turpitude, we held that the Board misinterpreted Arizona's aggravated DUI statute by failing to acknowledge that it prohibits more than that act alone. *Id.* at 1118-19. As we explained, section 28-1383(A)(1) can be violated (1) by "driving" while under the influence of intoxicating liquor or drugs with a suspended or otherwise restricted driver's license, *or* (2) by maintaining "actual physical control" of a vehicle under the same conditions. *Id.* When a criminal statute has multiple independent prongs, the Board must determine whether any conduct violative of the statute meets the relevant definition of a deportable offense under the INA. *Id.* at 1118. By failing to assess Arizona's aggravated DUI statute as such, we held that the Board committed an "error of law" and we expressed our doubt that it intended to categorize the second act as a crime of equal severity as the first. *Id.* at 1119. Still, we did not foreclose the possibility that a conviction under section 28-1383(A)(1) could qualify as a crime of moral turpitude if the record of conviction demon-

---

[4]DHS withdrew its charge that Campos was removable under 8 U.S.C. § 1227(a)(2)(A)(i).

strated that the offender had been driving at the time of the arrest.

Acknowledging *Hernandez-Martinez*, the IJ and the BIA in this case looked beyond the statute to the record of Campos's conviction and determined that the transcripts of his 1997 and 2002 plea hearings sufficiently established that both offenses for which he was convicted involved driving while intoxicated. Relying on *Lopez-Meza*, the BIA concluded that such convictions were crimes involving moral turpitude.[5]

## D

Campos timely filed a petition for review. A divided panel of our court denied the petition, upholding the Board's determination that a violation of Arizona's aggravated DUI statute that involves actual driving is a crime involving moral turpitude. *Marmolejo-Campos v. Gonzales*, 503 F.3d 922 (9th Cir. 2007), *reh'g en banc granted*, 519 F.3d 907 (9th Cir. 2008). We now consider this question en banc.

## II

## A

We have no jurisdiction to review a final order removing an alien on account of a conviction for a crime involving moral turpitude. 8 U.S.C. § 1252(a)(2)(C). Nevertheless, we have jurisdiction to review the Board's determination that Campos's convictions are, in fact, "crimes involving moral turpitude" as the INA defines that term. *See Ye v. INS*, 214 F.3d 1128, 1131 (9th Cir. 2000).

---

[5]The BIA also concluded that Campos' theft conviction constituted a crime involving moral turpitude. Campos does not dispute this conclusion on appeal. The only issues preserved on appeal with respect to his removability under 8 U.S.C. § 1227(a)(2)(A)(ii) are: (1) whether aggravated DUI rises to the level of a crime involving moral turpitude and (2) a limited challenge to the adequacy of the administrative record.

B

Before examining the Board's decision, we must determine the standard of our review, an issue which has been squarely raised in this case. The BIA's ultimate determination that a petitioner such as Campos has committed a crime involving moral turpitude requires two separate inquiries. First, the BIA must determine what offense the petitioner has been convicted of committing. This requires the agency to interpret the statute under which the petitioner was convicted and, in certain cases, to examine the record of conviction.[6] *See infra* at 2638-39. Second, once the Board has identified the petitioner's offense, it must determine whether such conduct is a "crime involving moral turpitude" as defined in the applicable section of the INA. This requires the Board to apply the definition of the term "moral turpitude" and to determine whether the petitioner's conduct meets such definition.

It is well established that we give no deference to the BIA's answer to the first question. The BIA has no special expertise by virtue of its statutory responsibilities in construing state or federal criminal statutes and, thus, has no special administrative competence to interpret the petitioner's statute of conviction. As a consequence, we review the BIA's finding regarding the specific act for which the petitioner was convicted *de novo*. *See Cuevas-Gaspar v. Gonzales*, 430 F.3d

---

[6]The Attorney General has recently stated that it may be appropriate for immigration judges to look beyond the record of conviction when applying the modified categorical approach. *See In re Silva-Trevino*, 24 I. & N. Dec. 687, 699 (A.G. 2008) ("[W]hen the record of conviction fails to show whether the alien was convicted of a crime involving moral turpitude, immigration judges should be permitted to consider evidence beyond that record if doing so is necessary and appropriate to ensure proper application of the Act's moral turpitude provisions."). As that question is not squarely before us, we reserve judgment as to the validity of that portion of our prior case law which suggests review should be more confined. *See, e.g.*, *Nicanor-Romero v. Mukasey*, 523 F.3d 992, 1007 (9th Cir. 2008) (limiting review to particular documents in the alien's record of conviction).

1013, 1017 (9th Cir. 2005); *Goldeshtein v. INS*, 8 F.3d 645, 647 n.4 (9th Cir. 1993).

The Board's answer to the second question requires a different standard of review. Our precedents, however, have not always been consistent. At times, we have suggested that the BIA's determination that a specific act is a crime of moral turpitude is a finding entitled to deference, although we have not prescribed the precise nature of such deference. *See Cerezo v. Mukasey*, 512 F.3d 1163, 1166 n.6 (9th Cir. 2008); *Hernandez-Martinez*, 329 F.3d at 1119. At other times, we have reviewed the determination *de novo*. *See, e.g.*, *Fernandez-Ruiz v. Gonzales*, 468 F.3d 1159, 1165 (9th Cir. 2006); *Cuevas-Gaspar*, 430 F.3d at 1018-20; *Notash v. Gonzales*, 427 F.3d 693, 696 (9th Cir. 2005).[7] And in still other cases, we have suggested that while our review might be deferential in theory, it is *de novo* in fact. *See Nicanor-Romero v. Mukasey*, 523 F.3d 992, 997-98 (9th Cir. 2008). In light of this uncertainty, we set forth the following principles.

1

**[1]** When the Board considers whether a certain crime involves "moral turpitude," it must interpret that term through a process of case-by-case adjudication.[8] When reviewing an

---

[7]Frequently, we have characterized the question presented in these cases as singular, i.e., whether the petitioner's statutory crime is a crime of moral turpitude. As noted, we review the BIA's interpretation of criminal statutes *de novo*. However, many of our prior cases have not acknowledged the second component of the BIA's inquiry, its interpretation of the INA. *See, e.g.*, *Cuevas-Gaspar*, 430 F.3d at 1017, 1018-20 (reviewing both components of the BIA's decision but suggesting that the standard of review is singular). One reason for such omission is that once the conduct proscribed by the petitioner's statute of conviction is identified (e.g., fraud), the question whether such conduct involves "moral turpitude" is not in doubt and thus merits little or no analysis from the court.

[8]The Attorney General is charged with the "administration and enforcement" of the INA and the "determination and ruling by the Attorney Gen-

agency's interpretation of its governing statute, we follow the two-step framework famously set forth in *Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Initially, we determine whether "the intent of Congress is clear." *Id.* at 842. If it is, both the court and the agency "must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43. If the statute is "silent or ambiguous," however, we may not supply the interpretation of the statute we think best (as we would without an agency pronouncement), but must limit ourselves to asking "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

**[2]** Not every agency interpretation of its governing statute is entitled to *Chevron* deference, however. In *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Supreme Court emphasized that *Chevron* only applies (1) "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," *and* when (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* at 226-27. In other words, before we apply *Chevron*, we must conclude that Congress delegated authority to the agency to interpret the statute in question and that the agency decision under review was made with a "lawmaking pretense." *Id.* at 233.

2

**[3]** The Board's interpretations of the INA made in the course of adjudicating cases before it satisfy the first requirement for *Chevron* deference set forth in *Mead*: the Board,

eral with respect to all questions of law [are] controlling." 8 U.S.C. § 1103(a)(1). While retaining ultimate authority, the Attorney General has delegated his discretion and authority in interpreting the INA to the BIA to exercise in the course of adjudicating cases before it. 8 C.F.R. § 1003.1(d)(1).

through the Attorney General's delegation, is authorized to promulgate rules carrying the force of law through a process of case-by-case adjudication and, thus, "should be accorded *Chevron* deference" as it exercises such authority to "give[ ] ambiguous statutory terms 'concrete meaning.' " *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 448-49 (1987)).

[4] Whether the Board's interpretations of the INA satisfy *Mead*'s second requirement depends on the form the Board's decision takes. "Our cases applying *Mead* treat the precedential value of an agency action as *the* essential factor in determining whether *Chevron* deference is appropriate." *Alvarado v. Gonzales*, 449 F.3d 915, 922 (9th Cir. 2006) (collecting cases). Thus, we have held that the Board's precedential orders, which bind third parties, qualify for *Chevron* deference because they are made with a "lawmaking pretense." *Id.* (internal quotation marks omitted). We have not accorded *Chevron* deference to the Board's unpublished decisions, however, because they do not bind future parties. *See Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1012-14 (9th Cir. 2006).[9]

[5] Nevertheless, *Skidmore* deference remains "intact and applicable" when an agency with rulemaking power interprets its governing statute without invoking such authority. *Mead*, 533 U.S. at 237 (discussing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). Under *Skidmore*, the measure of deference afforded to the agency varies "depend[ing] upon the thor-

---

[9]As we explained in *Garcia-Quintero*, the applicable regulations allow the BIA to decide most appeals through brief, nonprecedential orders authored by a single member of the Board. 8 C.F.R. § 1003.1(e)(5). Only if that member determines that a case presents "[t]he need to establish a precedent construing the meaning of laws, regulations, or procedures" is it transferred to a three-judge panel for decision in a published order. *See* 8 C.F.R. § 1003.1(e)(6). The Board's internal policies establish "[u]npublished decisions are binding on the parties to the decision but are *not* considered precedent for unrelated cases." BIA Prac. Man., Ch. 1.4(d)(ii) (rev. June 15, 2004).

oughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140. Recognizing that the BIA's interpretations of the INA are entitled to at least this much respect, we have applied *Skidmore* when reviewing its unpublished orders. *See, e.g.*, *Ortiz-Magana v. Mukasey*, 523 F.3d 1042, 1050 (9th Cir. 2008); *Estrada-Rodriguez v. Mukasey*, 512 F.3d 517, 520 (9th Cir. 2007); *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1113 (9th Cir. 2007); *Garcia-Quintero*, 455 F.3d at 1014.

3

In light of these principles, we consider the extent to which the BIA's interpretations of the term "moral turpitude" are entitled to our deference.

a

The meaning of the term falls well short of clarity. Indeed, as has been noted before, "moral turpitude" is perhaps the quintessential example of an ambiguous phrase. *See Galeana Mendoza v. Gonzales*, 465 F.3d 1054, 1055 (9th Cir. 2006).[10] In a series of published decisions, the BIA has set forth its general understanding that a "crime involving moral turpitude" involves "conduct that shocks the public conscience as being inherently base, vile, or depraved, contrary to the rules

---

[10]Some have suggested that the imprecision of the term "moral turpitude" demonstrates Congress's intent that its meaning be developed over time through judicial and administrative construction. Others have construed matters less charitably. As Justice Jackson once wrote, "Congress knowingly conceived [the term] in confusion," deliberately ignoring a warning raised by a member of the House that " '[n]o one can really say what is meant by . . . a crime involving moral turpitude.' " *Jordan v. De George*, 341 U.S. 223, 233-34 (1951) (Jackson, J., dissenting) (quoting *House Committee on Immigration and Naturalization Hearings on H.R. Rep. No. 10384*, 64th Cong., 1st Sess. 8 (1916)).

of morality and the duties owed between man and man, either one's fellow man or society in general." *In re Perez-Contreras*, 20 I. & N. Dec. 615, 618 (B.I.A. 1992); *see also In re Danesh*, 19 I. & N. Dec. 669, 670 (B.I.A. 1988) (same). In a welcome effort to "establish a uniform framework" for the determination of crimes involving moral turpitude, the Attorney General has recently decreed that "[a] finding of moral turpitude . . . requires that a perpetrator have committed [a] reprehensible act with some form of scienter." *In re Silva-Trevino*, 24 I. & N. Dec. 687, 688, 706 (A.G. 2008).

**[6]** Despite the principles set forth above, we have been hesitant to defer to such general statements by the Board, and we are not alone in this view. As the Seventh Circuit has explained, the Board's general understanding of the term "moral turpitude" is not the result of "any insights that it might have obtained from adjudicating immigration cases," *Mei v. Ashcroft*, 393 F.3d 737, 739 (7th Cir. 2004), but simply a recitation of the definition found in the criminal law, *see, e.g.*, *Benitez v. Dunevant*, 7 P.3d 99, 104 (Ariz. 2000); *In re Craig*, 82 P.2d 442, 444 (Cal. 1938); *In re Farina,* 972 P.2d 531, 541 (Wash. Ct. App. 1999). Thus, as we have stated before, because the Board's general definition of "moral turpitude" fails to "particularize" the term in any meaningful way, " 'giving *Chevron* deference . . . has no practical significance.' " *Galeana-Mendoza*, 465 F.3d at 1058 n.9 (quoting *Mei*, 393 F.3d at 739).

Consequently, without more specific guidance from the Board, we have relied on our own generalized definition of "moral turpitude," *see Carty v. Ashcroft*, 395 F.3d 1081, 1083 (9th Cir. 2005) (explaining that we have traditionally divided crimes involving moral turpitude into two basic types: "those involving fraud and those involving grave acts of baseness or depravity."); *see also Navarro-Lopez v. Gonzales*, 503 F.3d 1063, 1074 (9th Cir. 2007) (en banc) (Reinhardt, J., concurring for the majority) (same), although we have noted that our

understanding does not differ materially from the Board's, *Galeana-Mendoza*, 465 F.3d at 1058 n.9.

b

**[7]** Orders issued by the BIA contain more than an abstract definition of moral turpitude, however. When the Board adjudicates a case, it must determine whether a petitioner's offense, once established, meets the definition of such term. In so doing, it assesses the character, gravity, and moral significance of the conduct, drawing upon its expertise as the single body charged with adjudicating all federal immigration cases. This is precisely the type of agency action the Supreme Court instructs is entitled to *Chevron* deference. *See Aguirre-Aguirre*, 526 U.S. at 425. Indeed, we accord *Chevron* deference to the BIA's construction of other ambiguous terms in the INA promulgated through its precedential decisions. *See, e.g.*, *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 947-48 (9th Cir. 2007) ("particularly serious crime"); *Murillo-Espinoza v. INS*, 261 F.3d 771, 774 (9th Cir. 2001) ("conviction"); *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc) ("persecution"). Similarly, we accord *Skidmore* deference to the Board's nonprecedential decisions interpreting its governing statute. *See supra* at 2633-35 (collecting cases). We see no reason to exempt the Board's treatment of "moral turpitude" from these rules.

C

With this backdrop in mind, we now consider the proper standard of review in this case. The Board affirmed the IJ's order of removal, holding that Campos's 1997 and 2002 aggravated DUI convictions were "crimes involving moral turpitude" under the INA, 8 U.S.C. § 1227(a)(2)(A)(i), (ii). As previously explained, *supra* at 2630, we review *de novo* the Board's interpretation of the Arizona statute under which Campos was convicted. If we uphold such interpretation, we must consider the extent to which we will defer to the Board's

decision that the conduct it found the Arizona statute to prohibit—driving under the influence with a suspended or otherwise restricted license—is a crime of moral turpitude.

The BIA dismissed Campos's appeal in an unpublished order. That order, however, relied upon *Lopez-Meza*, a precedential decision addressing the dispositive question of statutory interpretation at issue in this case. As the Supreme Court has suggested, we conclude that where, as here, the Board determines that certain conduct is morally turpitudinous in a precedential decision, we apply *Chevron* deference regardless of whether the order under review is the precedential decision itself or a subsequent unpublished order that relies upon it. *See Aguirre-Aguirre*, 526 U.S. at 418, 425 (applying *Chevron* deference to a nonprecedential BIA order interpreting the phrase "serious nonpolitical crime" that relied on the interpretation of such phrase in an earlier precedential decision); *see also Mead*, 533 U.S. at 230 & n.12 (noting *Aguirre-Aguirre*'s application of *Chevron* deference with approval); *Garcia-Quintero*, 455 F.3d at 1014 (suggesting that *Chevron* deference may be appropriate when the BIA relies upon a precedential BIA decision "addressing the precise question at issue" in an unpublished order).

**[8]** In sum, we conclude that, once the elements of the petitioner's offense are established, our review of the BIA's determination that such offense constitutes a "crime of moral turpitude" is governed by the same traditional principles of administrative deference we apply to the Board's interpretation of other ambiguous terms in the INA. We have sometimes suggested otherwise in the past. *Nicanor-Romero*, 523 F.3d at 997 (declining to defer to the Board's *generalized* definition of "moral turpitude" but failing to assess the Board's particularized application of that definition to the petitioner's case); *Plasencia-Ayala v. Mukasey*, 516 F.3d 738, 744-45 (9th Cir. 2008) (rejecting the argument that "*Chevron* deference should apply to the BIA's interpretation of the 'amorphous phrase' 'crime involving moral turpitude' " even though such

interpretation was based on a precedential decision). We now overrule those cases and any others that have impliedly so held. And, in so doing, we join every other court of appeals to have considered the question. *See Ali v. Mukasey*, 521 F.3d 737, 739 (7th Cir. 2008); *Wala v. Mukasey*, 511 F.3d 102, 105 (2d Cir. 2008); *Knapik v. Ashcroft*, 384 F.3d 84, 87-88 (3d Cir. 2004); *Yousefi v. INS*, 260 F.3d 318, 325-26 (4th Cir. 2001); *Hamdan v. INS*, 98 F.3d 183, 185 (5th Cir. 1996); *Franklin v. INS*, 72 F.3d 571, 572 (8th Cir. 1995); *Cabral v. INS*, 15 F.3d 193, 194 (1st Cir. 1994).

### III

With our standard of review established, we examine the BIA's decision in this case. We begin with the Board's construction of Campos's aggravated DUI convictions.

### A

To determine whether a specific crime meets the definition of a removable offense listed in the INA, our court applies the categorical and modified categorical approaches set forth in *Taylor v. United States*, 495 U.S. 575 (1990). *See Cuevas-Gaspar*, 430 F.3d at 1017. While we first apply the categorical approach, if the statute of conviction is not a "categorical match" for the generic federal crime because it criminalizes both conduct that does involve moral turpitude and other conduct that does not, "we apply a 'modified' categorical approach." *Fernandez-Ruiz*, 468 F.3d at 1163. Under that approach, in the past, we have seen fit to " 'look beyond the language of the statute to a narrow, specified set of documents that are part of the record of conviction, including the indictment, the judgment of conviction, jury instructions, a signed guilty plea, or the transcript from the plea proceedings.' " *Id.* at 1163-64 (quoting *Tokatly v. Ashcroft*, 371 F.3d 613, 620 (9th Cir. 2004)). If these documents establish that the jury found, or the petitioner pled guilty to, elements of a crime

involving moral turpitude, he is properly removable. *Cuevas-Gaspar*, 430 F.3d at 1020.[11]

Arizona's aggravated DUI statute contains four elements. The first three elements are immediately apparent: A person must (1) "driv[e]" or maintain "actual physical control" over a vehicle, (2) while "under the influence of intoxicating liquor or drugs," (3) while his or her license or privilege to drive is "suspended, canceled, revoked, or refused or while a restriction is placed upon the person's driver license [as a result of a prior DUI-related offense]." Ariz. Rev. Stat. § 28-1383(A)(1); *see supra* 2626. As for the fourth element, Arizona courts have held that to sustain a conviction, the text of the statute requires the state to prove that the offender drove with a suspended or otherwise revoked license, and that he knew or should have known of the suspension or revocation. *See State v. Cramer*, 962 P.2d 224, 226 (Ariz. Ct. App. 1998) ("To support the conviction for aggravated DUI, the state is required to prove the defendant drove a motor vehicle under the influence of alcohol while his license was revoked and that he *knew or should have known* of the revocation." (emphasis added)); *State v. Superior Court*, 945 P.2d 1334, 1337 (Ariz. Ct. App. 1997) (same); *State v. Agee*, 887 P.2d 588, 590 (Ariz. Ct. App. 1994) (same); *see also State v. Williams*, 698 P.2d 732, 734 (Ariz. 1985) (same). "Should have known" is a negligence standard. *See State v. Hyde*, 921 P.2d 655, 678 (Ariz. 1996). The BIA has held that mere negligence cannot support a finding of moral turpitude. *See Perez-Contreras*, 20 I. & N. Dec. at 618-19.

In *Lopez-Meza*, the BIA concluded that a violation of section 28-1383(A)(1) was categorically a crime involving moral turpitude. 22 I. & N. Dec. at 1195-96. As noted, we rejected that conclusion in *Hernandez-Martinez* because the Board failed to acknowledge that section 28-1383(A)(1) indepen-

---

[11]Again, the Attorney General has suggested that a broader scope of review is appropriate. *See supra* note 6.

dently prohibits both driving *and* physically controlling a vehicle while under the influence and with a suspended or otherwise restricted license. *Hernandez-Martinez*, 329 F.3d at 1118. Still, we did not consider whether a violation of section 28-1383(A)(1) could qualify as a crime involving moral turpitude if the petitioner had actually been driving at the time of the arrest.

Acknowledging *Hernandez-Martinez*, the Board in the case before us examined the transcript of Campos's 1997 and 2002 plea hearings and concluded that his testimony in both proceedings plainly demonstrated that both convictions arose out of incidents in which he was actually driving. The Board's reliance on the plea transcripts was an appropriate application of the modified categorical approach. *See Tokatly*, 371 F.3d at 620. Moreover, they adequately show that Campos admitted to driving on both occasions. Accordingly, we agree with the Board that the 1997 and 2002 aggravated DUI convictions both involved actual driving.[12]

---

[12]We also recognize that they both involved actual knowledge, not mere negligence. Campos admitted in 1997 that he knew he did not have a valid license, and he admitted in 2002 that he knew his license had been suspended or revoked.

The dissent disagrees with our conclusion as to Campos's 1997 conviction. Dissent at 2664 n.15. The fact of Campos's conviction is proof that his license had been "suspended, canceled, revoked or refused" in 1997. Ariz. Rev. Stat. § 28-1383(A)(1). With this established, what else could Campos's admission—which indicated he knew he did not possess a valid license—have meant except that he knew his license was "suspended, canceled, revoked or refused"? Moreover, despite the fact that the BIA precedent under which he was deemed removable requires a knowledge scienter, *see Lopez-Meza*, 22 I. & N. Dec. at 1195-96, Campos never contends that he was convicted of anything but a "knowing" violation of section 28-1383. In any case, the record undeniably reflects that Campos *knew* he was "absolutely prohibited from driving." *Id.* at 1196.

Even if the record of Campos's 1997 DUI conviction does not establish the requisite mens rea, the point is academic. The BIA determined that he was alternatively removable on the basis of his 1990 theft conviction.

The Board then relied on its precedent in *Lopez-Meza* to conclude that such conduct is a crime involving moral turpitude. Thus, the Board's decision in this case must stand if *Lopez-Meza* is based on a permissible construction of the INA.

B

The BIA has never held that a simple DUI offense is a crime involving moral turpitude, a fact it attributes to "a long historical acceptance." *Lopez-Meza*, 22 I. & N. Dec. at 1194. Although the dangers of drunk driving are well established, the Board's unwillingness to classify it as a crime of moral turpitude is, perhaps, not surprising because statutes that prohibit driving under the influence typically do not require intent, but rather "are, or are most nearly comparable to, crimes that impose strict liability." *Begay v. United States*, 128 S. Ct. 1581, 1586 (2008); *id.* at 1587 ("[T]he conduct for which the drunk driver is convicted (driving under the influence) need not be purposeful or deliberate."); *see Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004) (stating that a DUI offense involves "accidental or negligent conduct").[13]

---

Campos did not appeal that portion of the BIA's decision, thus waiving any challenge to its validity. *See Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1164 (9th Cir. 2003) (explaining that we "will not consider matters on appeal that are not specifically and distinctly argued in an appellant's opening brief").

[13]The Supreme Court has held that simple DUI is not a "violent felony" as defined in the Armed Career Criminal Act, *Begay*, 128 S. Ct. at 1586, or a "crime of violence" under the INA, *Leocal*, 543 U.S. at 8-9. Nevertheless, because those terms contain different elements than a "crime involving moral turpitude," such holdings bear little relation to the question presented here. *See Begay*, 128 S. Ct. at 1586 (explaining that a "violent felony" must include "purposeful, *violent*, and *aggressive* conduct" (emphasis added; internal quotation marks omitted)); *Leocal*, 543 U.S. at 8-9 (stating that a "crime of violence" must have "as an element the use, attempted use, or threatened use of *physical force* against the person or property of another" (emphasis added; internal quotation marks omitted)).

**[9]** Yet the Board treats Arizona's prohibition on aggravated DUI differently because it contains an additional "aggravating" element: the offender's knowledge, at the time of the DUI, that the state has denied him the privilege to drive under any circumstances. *See Lopez-Meza*, 22 I. & N. Dec. at 1195 (citing Arizona caselaw interpreting section 28-1383(A)(1) as containing a knowledge requirement); *see supra* at 2639-40 (collecting such Arizona cases). Thus, the Board reasoned that "aside from the culpability that is often, but not inherently, present in a simple DUI offense," an individual who commits an aggravated DUI does so "knowing that he or she is *absolutely prohibited* from driving" and, in so doing, commits a morally turpitudinous offense. *Lopez-Meza*, 22 I. & N. Dec. at 1195-96 (emphasis added); *cf. Silva-Trevino*, 24 I. & N. Dec. at 706 & n.5 (noting that a scienter element is a hallmark of a crime involving moral turpitude); *Danesh*, 19 I & N. Dec. at 673 (explaining that knowing violation of the law "exhibits a deliberate disregard for the law, which we consider to be a violation of the accepted rules of morality and the duties owed to society").

1

Campos and the dissent argue that the Board's decision in his case cannot stand because *Lopez-Meza* conflicts with other BIA precedents and, thus, is not based on a permissible construction of the INA. They are correct that "[u]nexplained inconsistency" in an agency's interpretation of its governing statute can be "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005); Dissent at 2654-55. Nevertheless, we are mindful that such inconsistency provides a basis for rejecting an agency's interpretation only in "rare instances, such as when an agency provides no explanation at all for a change in policy, or when its explanation is so unclear or contradictory that we are left in doubt as to the reason for the change in direction." *Morales-Izquierdo v. Gonzales*, 486

F.3d 484, 493 (9th Cir. 2007) (en banc); *see also Lands Council v. Martin*, 529 F.3d 1219, 1225 (9th Cir. 2008) (applying *Morales-Izquierdo* to hold that the Forrest Service provided a "rational explanation" for its change in policy that did not leave the court "in doubt as to the reason for the change in direction" (internal quotation marks and citation omitted)).

Campos's argument is twofold. First, he argues that *Lopez-Meza* cannot be harmonized with a subsequent BIA decision, *In re Torres-Varela*, 23 I. & N. Dec. 78 (B.I.A. 2001), and that, as a result, the Board erred in relying on *Lopez-Meza* in his case. In *Torres-Varela*, the Board held that an alien who had violated Arizona's "recidivist DUI" statute, which punishes those who commit a DUI after already having three or more simple DUI convictions, had not committed a crime involving moral turpitude.[14] 23 I. &. N. Dec. at 85-86. Campos contends that if committing three separate DUIs is not morally turpitudinous, driving under the influence with a suspended or otherwise restricted license cannot be said to be more offensive conduct.

Yet the en banc panel of the Board in *Torres-Varela* acknowledged *Lopez-Meza* and reasoned that its holding did not conflict with that precedent. According to *Torres-Varela*, "[t]he aggravating factor rendering the DUI conviction a crime involving moral turpitude in . . . *Lopez-Meza* was the *culpable mental state* needed for a conviction under [section 28-1383(A)(1)]": the "showing that the defendant *knew*, at the time that he was driving while under the influence of alcohol, that his driver's license had been suspended and that he was not permitted to drive." 23 I. & N. Dec. at 85 (emphasis

---

[14]The petitioner in *Torres-Varela* was convicted of violating Arizona Revised Statutes section 28-697(A)(2), which has since been redesignated as section 28-1383(A)(2), *see supra* note 1, the subsection adjacent to Arizona's prohibition on aggravated DUI, section 28-1383(A)(1). The term "recidivist DUI" is not used in the Arizona statute, but we employ it here to distinguish § 28-1383(A)(2) from § 28-1383(A)(1).

added). The aggravating factor in a recidivist DUI conviction, however, is the fact that the offender has been convicted of simple DUI offenses before. In the Board's view, recidivist DUI "is based on an aggregation of simple DUI convictions" and, since no single simple DUI is a crime of moral turpitude, a collection of DUIs, no matter how many, can never qualify as such. *Id.* at 85-86.

[10] The Board in *Torres-Varela* offered a rational distinction between recidivist DUI and aggravated DUI offenses. Thus, we cannot accept Campos's argument that the Board should not have applied *Lopez-Meza*'s interpretation of the aggravated DUI statute at issue in this case. To reject the Board's distinction as arbitrary and capricious would be to reject its use of the knowledge element in the aggravated DUI statute as a permissible ground for treating an aggravated DUI differently from a recidivist DUI offense. Again, the Attorney General has declared the presence of scienter to be an essential element of a crime involving moral turpitude. *See Silva-Trevino*, 24 I. & N. Dec. at 706 & n.5. Such a distinction consistently has been critical to the BIA's determination of whether violation of a statute constitutes a crime involving moral turpitude. *See, e.g.*, *Perez-Contreras*, 20 I. & N. Dec. at 618 ("Where knowing or intentional conduct is an element of an offense, we have found moral turpitude to be present."); *Danesh*, 19 I. & N. Dec. at 673 (transforming assault into a crime involving moral turpitude because the statute required the offender to "know that the person assaulted is a peace officer"); *In re McNaughton*, 16 I. & N. Dec. 569, 574 (B.I.A. 1978) (stating that "whenever a crime has involved intent to defraud, it has been found to involve moral turpitude"); *In re Abreu-Semino*, 12 I. & N. Dec. 775, 777 (B.I.A. 1968) (stating that "moral turpitude normally inheres in the intent"); *In re P-*, 6 I. & N. Dec. 795, 798 (B.I.A. 1955) (same); *In re R-*, 6 I. & N. Dec. 772, 773-774 (B.I.A. 1955) (stating the rule that "unless the statute under consideration requires knowledge on the part of the receiver that the goods were obtained unlawfully the offense defined does not necessarily involve

moral turpitude"); *In re M-*, 2 I. & N. Dec. 721, 723 (B.I.A. 1946) (holding that an offense involving a breaking and entering may be deemed to involve moral turpitude only if it is accompanied by the intent to commit a morally turpitudinous act after entry); *In re G-*, 1 I &. N. Dec. 403, 404-06 (B.I.A. 1943) (same). While we recognize that Campos's knowledge that he was driving without a license does not exactly add a knowing or intentional element to DUI because the intent involved is different, we cannot conclude that the Board acted irrationally in using intent as a ground to draw a distinction between recidivist DUI and aggravated DUI.

The dissent criticizes our deference to the BIA's conclusion that the presence or absence of a mens rea element in the statute of conviction can be essential to a determination of whether a crime involves moral turpitude. The "real question," the dissent asserts, is "what *is* a sufficiently 'culpable mental state?'" Dissent at 2665. This stands in stark contrast to the Attorney General's determination that "*some form* of scienter" is all that is required in order to conclude that a crime involves moral turpitude. *Silva-Trevino*, 24 I. & N. Dec. at 706 (emphasis added). Indeed, the dissent asks us to apply a heightened standard of review, a standard of review far beyond the deferential approach mandated by *Chevron*. Because the statutory text is devoid of any provision which requires a particular level of scienter, we must defer to the agency's case-by-case adjudication of the matter so long as its construction of the statute is permissible. *See Aguirre-Aguirre*, 526 U.S. at 424-25. As the dissent itself admits, the BIA has not seen fit to create a categorical level of scienter for all crimes involving moral turpitude: nor is it required to. Here, after assessing "the statutory definition" and "the nature of the crime," *McNaughton v. INS*, 612 F.2d 457, 459 (9th Cir. 1980), the BIA concluded that given the mens rea involved, the crime was one of moral turpitude.

To the extent such a conclusion conflicts with prior BIA precedent, this is not one of those "rare instances" where we

should withhold deference. *Morales-Izquierdo*, 486 F.3d at 493; *see also Lands Council*, 529 F.3d at 1225. The agency has not failed to provide an explanation for its action. To the contrary, the BIA explicitly pointed to the significance of the mens rea element, a significance only confirmed by *Silva-Trevino*. *See Lopez-Meza*, 22 I. & N. Dec. at 1195-96; *see also Silva-Trevino*, 24 I. & N. Dec. at 706; *Torres-Varela* 23 I. & N. Dec. at 85. Such explanation is not irrational, and it certainly does not leave us "in doubt as to the reason for the change in direction." *Morales-Izquierdo*, 486 F.3d at 493; *see also Lands Council*, 529 F.3d at 1225. The dissent would have us be persuaded by the reason for the change. Our precedent does not require so much.

2

Second, Campos, along with the dissent, argues that the Board's decision in *Lopez-Meza* cannot be reconciled with its prior holding in *In re Short*, 20 I. & N. Dec. 136 (B.I.A. 1989). In that case, the Board held that the federal offense "assault with intent to commit any felony" could not be categorized as a crime involving moral turpitude without first considering whether the underlying felony was itself such an offense. *Id.* at 139 (discussing 18 U.S.C. § 113(b) (repealed 1994)). The Board reasoned that because simple assault is not a crime involving moral turpitude, "if . . . the felony intended as a result of that assault also does not involve moral turpitude, then the two crimes combined do not involve moral turpitude." *Id.* The Board then stated that "[m]oral turpitude cannot be viewed to arise from some undefined synergism by which two offenses are combined to create a crime involving moral turpitude, where each crime individually does not involve moral turpitude." *Id.*

Campos and the dissent contend that this latter statement from the Board's opinion in *Short* governs this case. Because the Board has never held that simple DUI or driving with a suspended license, standing alone, are crimes of moral turpi-

tude, they argue that committing both offenses at the same time is not a crime involving moral turpitude either. Yet the en banc panel in *Lopez-Meza* considered the same argument and rejected it. As the BIA explained,

> [w]e *did not hold* in [*Short*] that a combination of acts that are included as elements of a specific offense could *never*, when added together, build to such a heightened deviance from accepted moral standards as to reach a level of conduct deemed morally turpitudinous. In fact, additional aggravating elements can often transform an offense that otherwise would not be a crime involving moral turpitude into one that is.

*Lopez-Meza*, 22 I. & N. Dec. at 1196 (emphasis added). In other words, the Board construed *Short* as prohibiting a finding of moral turpitude based on the amalgamation of offenses in *that* case (simple assault with intent to commit a felony of unproven seriousness), but held that *Short* did not prohibit a finding of moral turpitude based on *any* combination of acts proscribed by a single criminal statute that might arise in a future case.

We conclude that the Board provided a reasoned explanation for its resolution of any tension between its holdings in *Lopez-Meza* and *Short*. *See Brand X*, 545 U.S. at 1000-01. Moreover, the Board's rejection of the rule Campos seeks is not irrational. It is possible that two separate acts may not be turpitudinous standing alone, but that their commission in tandem rises to the level of an offense so contrary to accepted societal standards as to result in a crime involving moral turpitude.[15]

---

[15]The dissent derides this "lame[ ] attempt" to distinguish *Lopez-Meza* from *Short*, demanding that the BIA explain "by what logic" it can reach the conclusion it sets forth. Dissent at 2678-80. Again, the dissent demands more than is required by *Chevron*. The BIA's distinction is not

**[11]** The Board's en banc decision in *Lopez-Meza* was accompanied by a dissent that would have held that aggravated DUI is not a crime involving moral turpitude. Our decision today is likewise accompanied by a vigorous dissent. The existence of such dissents indicates that the question of whether the offense at issue rises to the level of a crime involving moral turpitude is one upon which reasonable minds can differ. Yet Congress left the choice between reasonable interpretations of the INA to the Attorney General and, by his delegation, to the BIA, and " 'desired [that body] (rather than the courts) to possess whatever degree of discretion the ambiguity allows.' " *Brand X*, 545 U.S. at 982 (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 740-41 (1996)). We are satisfied that the Board's determination—DUI offenses committed with the knowledge that one's driver's license has been suspended or otherwise restricted are crimes involving moral turpitude—is a reasonable interpretation of the INA. The deferential standard that governs our review requires no more.

IV

Accordingly, Campos's petition for review is

**DENIED**.

---

irrational: *Short* did not purport to establish a categorical rule. It is possible that two non-turpitudinous offenses, committed at the same time could rise to the level of a crime involving moral turpitude. As the Chief Judge mentioned at oral argument, while neither simple DUI nor driving at excessive speeds individually constitute crimes involving moral turpitude, it would not be irrational to conclude that driving at excessive speeds while drunk amounted to "conduct that shocks the public conscience as being inherently base, vile, or depraved." *Perez-Contreras*, 20 I. & N. Dec. at 618.

To the extent *Lopez-Meza* is somehow inconsistent with *Short*, as we stated previously, the agency's explanation for its departure does not leave us "in doubt as to the reason for the change in direction." *Morales-Izquierdo*, 486 F.3d at 493; *see also Lands Council*, 529 F.3d at 1225.

BYBEE, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the BIA is entitled to *Chevron* deference when it issues a precedential decision holding that particular conduct is morally turpitudinous *and* when it subsequently issues an unpublished order relying upon that precedential decision. As the majority notes, today's decision clarifies an area of confusion in our case law and harmonizes our approach with that of other circuits who have considered this issue. I am therefore pleased to join Parts I and II of the court's opinion.

I dissent, however, from Part III of the court's opinion and from its judgment. As Judge Berzon convincingly demonstrates in her opinion, the BIA's decision in *In re Lopez-Meza*, 22 I. & N. Dec. 1188 (B.I.A. 1999), cannot be plausibly reconciled with BIA precedent. The BIA has already determined that even a third recidivist conviction for drunk driving does not constitute a crime involving moral turpitude ("CIMT"), *see Matter of Torres Varela*, 23 I. & N. Dec. 78 (B.I.A. 2001), and the agency has categorically stated that "[m]oral turpitude cannot be viewed to arise from some undefined synergism by which two offenses are combined to create a crime involving moral turpitude." *Matter of Short*, 20 I. & N. Dec. 136, 139 (B.I.A. 1989). In light of these decisions—as well as the BIA's consistently expressed view that regulatory offenses do not involve moral turpitude—the BIA's conclusion that driving under the influence without a valid driver's license constitutes a CIMT cannot be deemed reasonable.

Of course, an agency is not prohibited from reconsidering the wisdom of past decisions in light of changed circumstances and past experience. Thus, I might well have viewed this case differently if the BIA had issued a well-considered opinion formally overruling either *Torres-Varela*, *Short*, or both. However, here the BIA did not take the opportunity to overrule or formally limit its past decisions. Instead, the

agency supported its moral turpitude finding by baldly stating "that a person who drives while under the influence, knowing that he or she is absolutely prohibited from driving," has committed a CIMT. *Lopez-Meza*, 22 I. & N. Dec. at 1196. The agency attempted to distinguish *Short* by noting that *Short* involved only the question whether simple assault with intent to commit a felony constituted a CIMT, but the BIA did not even attempt to explain how its decision in *Lopez-Meza* was consistent with the language in *Short*, quoted above, which broadly precludes the BIA from doing exactly what it did here —combining two non-turpitudinous offenses to create a CIMT. *Id.* An agency has an obligation of consistent dealing and we cannot, even under *Chevron*, affirm an agency decision that offers nothing more than a conclusory and disingenuous attempt to distinguish past decisions that clearly mandate a result contrary to the one the agency has reached.

I thus respectfully dissent from the court's judgment.

**Volume 2 of 2**

BERZON, Circuit Judge, with whom PREGERSON, FISHER, and PAEZ, Circuit Judges, join, dissenting:

I agree with the majority that *Chevron U.S.A. Inc.*, *v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), is the correct framework within which to evaluate whether deference is due to the BIA's holding, in a precedential decision, that a conviction under Arizona Revised Statutes § 28-1383(A)(1) constitutes a "crime involving moral turpitude" ("CIMT") for purposes of 8 U.S.C. § 1227(a)(2)(A)(ii). I agree, further, that when such a precedential holding directly controls the outcome in a subsequent, non-precedential case, we evaluate that holding under the *Chevron* framework as well.[1]

I disagree, however, with the majority's conclusion in Part III of its opinion that, under *Chevron*, deference is in fact merited in this case. Although the BIA's precedential decision in *Matter of Lopez-Meza*, 22 I. & N. Dec. 1188 (B.I.A. 1999), directly controls Marmolejo-Campos's case, *Lopez-Meza* is the epitome of an unreasonable agency interpretation, to which we need not defer under *Chevron*.

As the majority explains, *Chevron*, at what has come to be known as Step Two, instructs us to defer to an agency's interpretation of ambiguous statutory language so long as that interpretation is "a reasonable policy choice for the agency to make." *Chevron*, 467 U.S. at 845. I can imagine few starker examples of unreasonable agency action than *Lopez-Meza*, the precedential decision dispositive in this case. Drunk driving is

---

[1]The BIA's holding in a prior precedential decision that a conviction under a given criminal statute is a CIMT will be entitled to *Chevron* deference in a subsequent case only if the prior holding *directly* controls the outcome in the subsequent case. We so held in *Garcia-Quintero v. Gonzales*, 455 F.3d 1006, 1014 (9th Cir. 2006) ("[T]he BIA has never issued a published decision addressing the precise question at issue. Although the BIA's order cited several published BIA decisions, none of them sets forth a binding interpretation of the question at issue. . . . Therefore, we do not accord *Chevron* deference to the BIA's decision in this case.").

not, by itself, a CIMT; nor is driving on a suspended license; nor is a second (or third) drunk driving conviction. Yet under *Lopez-Meza*, drunk driving only once, while on a suspended license, *is* a CIMT. This holding is utterly illogical. And beyond defying common sense, *Lopez-Meza* makes no attempt to square its holding with prior BIA case law forbidding such "undefined synergism[s]" of individually non-turpitudinous offenses. *Matter of Short*, 20 I. & N. Dec. 136, 139 (B.I.A. 1989). I fail to see how we can grant *Chevron* deference to this latest interpretive whim of an agency that continually refuses to state a coherent definition of, or follow a coherent approach to, the vague CIMT statutory term it is charged with applying. I therefore respectfully dissent.

## I.

### Unreasonable Interpretations Under *Chevron*

I begin with some observations concerning the degree of consistent decision-making we demand of an agency before deferring under *Chevron* to that agency's interpretation of its governing statute.

I recognize, first, that an agency's interpretation of an ambiguous statutory term can merit deference even if "the agency has from time to time changed its interpretation of the term." *Chevron*, 467 U.S. at 863. So, when an agency articulates an interpretation of its governing statute in the type of decision for which *Chevron* deference is otherwise appropriate, *see United States v. Mead Corp.*, 533 U.S. 218, 230-34 (2001), that "interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863-64. We assume that by leaving gaps in a statute, Congress intended to give the agency charged with filling those gaps the flexibility to adapt its reading in light of changing circum-

stances and policy priorities, and we apply the *Chevron* framework with this flexibility in mind. *Id.* at 843-44.

At the same time, agencies are *not* free, under *Chevron*, to generate erratic, irreconcilable interpretations of their governing statutes and then seek judicial deference. Consistency over time and across subjects is a relevant factor at *Chevron* Step Two, when deciding whether the agency's current interpretation is "reasonable."[2] *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) (observing that the Court would not need to defer to the INS's interpretation of the term "well-founded fear" at *Chevron* Step Two because "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view.") (internal quotation marks omitted).[3]

Moreover, when an agency does change its mind, it must provide an adequately reasoned explanation for the change. "Sudden and unexplained change, or change that does not

---

[2]To be clear, inconsistency in agency interpretations does not mean that the *Chevron* framework does not *apply*. Rather, an unexplained inconsistency may be a reason for a court — having found that *Chevron* is the correct framework to apply to the type of agency interpretation in question, having determined that the relevant statutory language is ambiguous at *Chevron* Step One, and moving on to apply *Chevron* Step Two — to find the agency interpretation "unreasonable" and decline to give it deference. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981, 1001 n.4 (2005) [hereinafter "*Brand X*"].

[3]*See also Barnhart v. Walton*, 535 U.S. 212, 219-20 (2002) (granting *Chevron* deference because "the Agency's regulations reflect the Agency's own longstanding interpretation. And this Court will normally accord particular deference to an agency interpretation of 'longstanding' duration.") (internal citations omitted); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due."); *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 698 (1991) ("As a general matter, of course, the case for judicial deference is less compelling with respect to agency positions that are inconsistent with previously held views.").

take account of legitimate reliance on prior interpretation, may be arbitrary, capricious [or] an abuse of discretion," and therefore unworthy of deference. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (internal quotation marks and citations omitted); *see also Brand X*, 545 U.S. at 1000 ("[T]he Commission is free within the limits of reasoned interpretation to change course if it adequately justifies the change."); *Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991) (deferring to the Secretary of Health and Human Services' interpretation, because "the Secretary amply justified his change of interpretation with a 'reasoned analysis' "). To satisfy this requirement, the agency must provide not only a reasoned explanation for its current position, but also a reasoned explanation for why the change was warranted or why the new position is preferable.

This last check on agency discretion is particularly important when an agency interprets its governing statute, as the BIA does, primarily through adjudication. The flexibility *Chevron* accords is meant to give agencies room to "inform[ ]" themselves and "[re-]consider" the wisdom of their policies, 467 U.S. at 863-64 — *not* to allow them to proceed entirely ad hoc, capriciously deciding individual cases without any concern for generating a coherent body of interpretation and without pursuing a set of articulable and reconcilable policy goals. That is why, when agencies depart from their prior interpretations, they must offer a reasoned explanation for doing so. This requirement is rooted not only in the APA's prohibition on arbitrary and capricious action, but in the rule of law itself, for "unreasoned decisionmaking . . . prevent[s] both consistent application of the [rule] by subordinate agency personnel . . . and effective review of the [rule] by the courts." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 375 (1998). *See also CBS v. FCC*, 454 F.2d 1018, 1025 (D.C. Cir. 1971) ("Without such a requirement [as reasoned decisionmaking], effective judicial review would be impractical if not impossible, and administrative litigants and the public

generally would be set adrift on a potential sea of unconscious preference and irrelevant prejudice.").

## II.

### *Lopez-Meza* as an Unreasonable Agency Interpretation

Viewed against these bedrock principles, the BIA's *Lopez-Meza* ruling merits no deference from this Court.

Overall, the BIA's precedential case law regarding the meaning of the phrase "crime involving moral turpitude" ("CIMT") is a mess of conflicting authority. To the degree that one is able to extract strands of relative coherence from that disarray, however, *Lopez-Meza* is inconsistent with those strands in two important respects. First, mere knowledge is not a sufficiently culpable mental state to transform a *regulatory* offense, such as driving without a license or simple driving under the influence ("DUI"), into a CIMT. As discussed in Section II.A, below, when the offense in question is a non-fraud offense, the BIA generally requires some variant of "evil intent" to establish turpitude. When the offense is a mere *regulatory* offense, however, unrelated to a fraud or sex offense, the BIA will not consider it a CIMT *regardless* of what mental state the underlying statute specifies as a requirement for conviction. *Lopez-Meza* breaks with this principle by holding that the "knew or should have known" standard associated with A.R.S. § 28-1383(A)(1) is a sufficiently "evil" mens rea to transform that regulatory offense into a CIMT.

Second, as discussed in Section II.B, the BIA's case law indicates that if two offenses are not in themselves morally turpitudinous, they cannot be "synergis[tically]" combined to create a CIMT. *Matter of Short*, 20 I. & N. Dec. 136, 139 (B.I.A. 1989). By combining two non-CIMTs to create a CIMT, *Lopez-Meza* is inconsistent with this strand of the agency's case law as well.

As to neither deviation does *Lopez-Meza* provide an adequately reasoned justification. In a context in which the agency has ventured precious few attempts at enunciating any generally applicable principles, *Lopez-Meza*'s deviation from the few principles that do exist is of special significance in undermining any semblance of reasoned decisionmaking. *Cf. CBS*, 454 F.2d at 1025 (noting that, for due process and public reliance reasons, "judicial vigilance to enforce the rule of law in the administrative process is particularly crucial where, as here, the area under consideration is in a constant state of flux.").

## A.   Knowledge or Negligence as a CIMT Mental State

### 1.   *The relevance of intent in the BIA's case law*

As the majority observes, the BIA has never offered a comprehensive definition of the term "crime involving moral turpitude" to which we could defer under *Chevron*. Slip Op. at 2634-35 (quoting *Galeana-Mendoza v. Gonzales*, 465 F.3d 1054, 1058 n.9 (9th Cir. 2006)). Although the Attorney General recently took a small step toward establishing a general definition in *Matter of Silva-Trevino*, 24 I. & N. Dec. 687 (A.G. 2008), by opining that a CIMT "must involve both reprehensible conduct and some degree of scienter," *id.* at 689, the majority rightly treats this definition as ineligible for *Chevron* deference, because it is too vague to be a meaningful clarification of the notoriously ambiguous statutory term. Slip Op. at 2635.[4]

---

[4]Having offered this capacious definition, which he terms a "rearticulat-[ion]" of the standard the BIA has "long applied," the Attorney General then states his "belie[f] [that] the definition in existing Board precedent merits judicial deference under controlling Supreme Court decisions." *Silva-Trevino*, 24 I. & N. Dec. at 689 n.1. Issuing a blanket definition at such an elevated level of generality as to retrospectively encompass virtually every BIA decision that has come before or will come afterward cannot create a rule entitled to *Chevron* deference if none existed before — and, as we held in *Galeana-Mendoza*, 465 F.3d at 1058, none did.

In the absence of a meaningful definition of "crimes involving moral turpitude" generally, the *Chevron* framework is applicable only to the BIA's holdings in individual cases that particular offenses are, or are not, CIMTs. For example, the BIA has held fraud, "murder, rape, robbery, kidna[p]ping, voluntary manslaughter, some involuntary manslaughter offenses, [certain] aggravated assaults, mayhem, theft offenses, spousal abuse, child abuse, and incest" to be CIMTs. *Lopez-Meza*, 22 I. & N. Dec. at 1193 (citing no cases); *see also Matter of Sanudo*, 23 I. & N. Dec. 968, 973 (B.I.A. 2006) (assault and battery involving the intentional infliction of serious bodily injury on another); *Matter of Logan*, 17 I. & N. Dec. 367 (B.I.A. 1980) (assault with a deadly weapon); *Matter of Leyva*, 16 I & N. Dec. 118, 120 (B.I.A. 1977) (burglary with intent to commit theft); *Matter of Beato*, 10 I. & N. Dec. 730, 732 (B.I.A. 1964) (rape); *Matter of Y-*, 3 I. & N. Dec. 544 (C.O. 1949) (incest). Conversely, the BIA has held that most assaults and batteries, alien smuggling offenses, indecency offenses, and rioting offenses are *not* CIMTs. *See Matter of S—*, 9 I. & N. Dec. 688 (B.I.A. 1962) (assault and battery); *Matter of Tiwari*, 19 I. & N. Dec. 875 (B.I.A. 1989) (alien smuggling); *Matter of Mueller*, 11 I. & N. Dec. 268 (B.I.A. 1965) (indecency); *Matter of O—*, 4 I. & N. Dec. 301 (B.I.A. 1951) (rioting).

Despite this relative consistency in outcome, it is hard to say that any articulable principle distinguishes the offenses that are CIMTs from those that are not. Instead, the BIA has issued precedential decisions[5] making seemingly definitive

---

[5]The BIA issues "precedential" (also called "published") and "non-precedential" (also called "unpublished") decisions. Precedential decisions "serve as precedents in all [future] proceedings involving the same issue or issues," 8 C.F.R. § 1003.1(g), and, unless "modified or overruled," are "binding on all officers and employees of the Department of Homeland Security or immigration judges in the administration of the immigration laws of the United States." *Id.* Only decisions issued by three-member panels, by the Board sitting en banc, or more rarely, by the Attorney Gen-

pronouncements on both sides of possible lines of demarcation.

For example, the BIA has described the term "crime involving moral turpitude" as a classification aimed primarily at "serious" and "dangerous" crimes. *Matter of E-*, 2 I. & N. Dec. 134, 139-40 (B.I.A. 1944). Yet, it has also cautioned that "[n]either the seriousness of a criminal offense nor the severity of the sentence imposed therefor is determinative of whether a crime involves moral turpitude." *Matter of Tran,* 21 I. & N. Dec. 291, 293 (B.I.A. 1996); *see also Silva-Trevino*, 24 I. & N. Dec. at 705; *Matter of Serna,* 20 I. & N. Dec. 579 (B.I.A. 1992).

Similarly, the BIA has declared that the definition of a CIMT is " 'an act which is per se morally reprehensible and intrinsically wrong, or malum in se, so it is the nature of the act itself and not the statutory prohibition of it which renders a crime one of moral turpitude.' " *Matter of Fualaau*, 21 I. & N. Dec. 475, 477 (B.I.A. 1996) (quoting *Matter of Franklin*, 20 I. & N. Dec. 867, 868 (B.I.A. 1994)). Yet, the BIA has

---

eral or the Secretary of Homeland Security, may be designated as precedential. *See id.* at §§ 1003.1(e)(6)(ii); 1003.1(g); 103.3(c). In contrast, decisions issued by single Board members — which make up the vast majority of BIA dispositions — are by definition non-precedential.

All decisions designated to serve as precedent are published in bound volumes of the reporter entitled *Administrative Decisions Under the Immigration & Nationality Laws of the United States* (or "I. & N. Dec."). Separately, the Executive Office of Immigration Review periodically compiles certain unpublished decisions as so-called "indexed decisions," which are meant to serve as useful but non-binding guidance for EOIR staff. *See* BIA PRAC. MAN., Ch. 1.4(d) (rev. July 30, 2004), *available at* http://www.usdoj.gov/eoir/vll/qapracmanual/pracmanual/chap1.pdf. Indexed decisions are, nevertheless, non-precedential. *Id.*

In the discussion that follows, I consider only the BIA's precedential CIMT decisions, as these embody the agency's official interpretations of "the meaning of [the governing] law[ ]." 8 C.F.R. § 1003.1(e)(6)(ii).

designated offenses ranging from the knowing possession of child pornography,[6] to the sale of "a number of packages of oleomargarine labeled as butter, in violation of . . . the Food, Drug, and Cosmetic Act [and] . . . with intent to defraud,"[7] as "morally reprehensible" conduct,[8] without specifying with any clarity what "the nature of th[ose] act[s]" have in common. *Matter of Fualaau,* 21 I. & N. Dec. at 477.

Aside from the severity or baseness of the crime at hand, the BIA also often looks to the mental state involved when distinguishing between CIMTs and non-CIMTs — again, with stark inconsistencies across cases. The BIA has stated definitively that " 'evil intent' is a requisite element for a crime involving moral turpitude," *Matter of Khourn*, 21 I. & N. Dec. 1041, 1046 (B.I.A. 1997), and indeed that "evil or malicious intent is . . . the essence of moral turpitude." *Matter of Flores*, 17 I. & N. Dec. 225, 227 (B.I.A. 1980). Yet, the Board has also held that the "presence or absence of a corrupt or vicious mind is not controlling" in determining whether an offense is a CIMT, *Matter of Medina*, 15 I. & N. Dec. 611, 614 (B.I.A. 1976), and even that certain strict liability offenses may qualify as CIMTs. *See Matter of Imber*, 16 I. & N. Dec. 256, 258 (B.I.A. 1977) (observing that "statutory rape has repeatedly been held to involve moral turpitude, despite the strict liability nature of the crime."). In fact, at various times and in various contexts, the BIA has held such diverse mental states as "evil intent,"[9] "wil[l]fulness,"[10] "recklessness,"[11] "knowledge,"[12]

---

[6]*Matter of Olquin-Rufino*, 23 I. & N. Dec. 896, 897 (B.I.A. 2006).

[7]*Matter of P-*, 6 I. & N. Dec. 795, 796 (B.I.A. 1955) (internal quotation marks omitted).

[8]*See Matter of Olquin-Rufino*, 23 I. & N. at 898 ("[T]he offense of possession of child pornography is morally reprehensible and intrinsically wrong."); *Matter of P-*, 6 I. & N. Dec. at 798 ("[T]he offenses for which respondent was convicted . . . were inherently wrong and morally reprehensible, not merely prohibited by statute of recent origin.").

[9]*See Matter of Tiwari*, 19 I. & N. Dec. 875, 882-83 (B.I.A. 1989) (holding that an alien smuggling offense is not categorically a CIMT because

and even "forgetfulness"**[13]** to be necessary or sufficient to support a finding of moral turpitude.

The Attorney General's recent holding in *Silva-Trevino* is no improvement on the existing mess. *Silva-Trevino* holds that "some degree of scienter" is required for a CIMT. 24 I. & N. Dec. at 689. Yet, the common definition of "scienter" is nothing more than "a degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission." BLACK'S LAW DICTIONARY 1081 (7th ed. 2000). So *Silva-Trevino* merely begs the question: *What* "degree of knowledge" is sufficient to indicate moral turpitude? The Attorney General suggests that "specific intent, deliberateness, willfulness, or recklessness," *id.*, may be sufficient — a list he later rounds out by adding "knew, or reasonably

---

"[v]iolations of the immigration laws, in the absence of 'fraud or evil intent,' are not ordinarily regarded as involving moral turpitude" and "some persons convicted [of alien smuggling] . . . have been motivated by 'love, charity, or kindness,' or by religious principles [rather than] . . . . an '*evil intent*.' ") (internal citations omitted; emphasis added).

**[10]***Matter of Alfonso-Bermudez*, 12 I. & N. Dec. 225, 226-27 (B.I.A. 1967) (holding that a California conviction for "*wil[l]fully* and unlawfully offer[ing] to commit a lewd or indecent act with another person" is a CIMT) (emphasis added).

**[11]***See Matter of Fualaau*, 21 I. & N. Dec. 475, 478 (B.I.A. 1996) (explaining that the element of a "*reckless* state of mind" is enough to make an assault conviction under Hawaii law a CIMT, but only if "the infliction of serious bodily injury" is also an element under the statute) (emphasis added).

**[12]***See Matter of Danesh*, 19 I. & N. Dec. 669, 673 (B.I.A. 1988) (holding that a Texas conviction for aggravated assault on a peace officer is a CIMT because the statute required both "bodily harm to the victim" and "*knowledge* by the offender that his force is directed to an officer who is performing an official duty") (emphasis added).

**[13]***See Matter of Tobar-Lobo*, 24 I. & N. Dec. 143, 145 (B.I.A. 2007) (holding that the failure to register as a convicted sex offender under California law is categorically a CIMT, even if California courts allow for convictions for "fail[ure] . . . as a result of forgetfulness.").

should have known," as well. *Id.* at 707. Of course, "reasonably should have known" is not a culpable mental state; it is an objective standard of negligence, disregarding the defendant's actual state of mind. The Attorney General's concept of "some scienter" therefore includes just about every possible mental state and even one imputed mental state, without providing any indication of which one would be sufficient in what circumstances. *Silva-Trevino*'s "scienter" standard is thus wholly vacuous.

*Lopez-Meza* takes note of some of the BIA's previous conflicting holdings about the relevance of intent in distinguishing CIMT from non-CIMT offenses, but it does not attempt to synthesize or distinguish those cases. Instead, it glibly summarizes the cases by recognizing that "while crimes involving moral turpitude *often* involve an evil intent, such a specific intent is *not a prerequisite* to finding that a crime involves moral turpitude." *Lopez-Meza*, 22 I. & N. Dec. at 1192 (emphases added). This statement is simply an observation of the obvious, not a reasoned explanation of the BIA's apparent lack of a coherent line of authority.

More than that, the sentence just quoted misleadingly conflates "evil intent" with "specific intent." The BIA has generally understood "evil intent" to mean something more than mere knowledge; in some cases, it has specified that "evil intent" involves a degree of depravity above and beyond the specific intent to violate the law.[14] *Lopez-Meza*, however, uses

[14]*See, e.g., Matter of Solon*, 24 I. & N. Dec. 239, 241 (B.I.A. 2007) ("Offenses characterized as 'simple assaults' are generally not considered to be crimes involving moral turpitude. . . . This is so because they require *general intent only* and may be committed *without the evil intent*, depraved or vicious motive, or corrupt mind associated with moral turpitude.") (internal quotation marks and citation omitted; emphasis added); *Matter of B-M-*, 6 I. & N. Dec. 806, 808-09 (B.I.A. 1955) ("In some penal statutes, the word 'wi[l]lful' connotes moral turpitude or evil of mind, but in others it means no more than that the interdicted act is done deliberately and with knowledge. We think th[e latter] clearly is the sense in which the

the terms "evil" and "specific" intent as though they were interchangeable.

Having thus further muddied the already opaque waters, *Lopez-Meza* then concludes that the "knew or should have known" standard associated with the driving-on-a-suspended-license portion of the Arizona aggravated DUI offense renders that entire offense a CIMT — even though "knew or should have known" is clearly a less demanding standard than *either* "evil" *or* "specific" intent. Specifically, *Lopez-Meza* reasons that although simple DUI is not a CIMT, aggravated DUI under § 28-1383(A)(1) *is* a CIMT because, unlike simple DUI, a conviction for aggravated DUI requires that at the time of the offense the driver's license was "suspended, canceled, revoked . . . [,] refused or [restricted due to a prior DUI offense]." A.R.S. § 28-1383(A)(1). The circumstance of having an already suspended or revoked license implies that the driver knows he "should not be driving under any circumstances." *Lopez-Meza*, 22 I. & N. Dec. at 1196. And because "any circumstances" necessarily includes the circumstance of driving while intoxicated, *Lopez-Meza* reasons, aggravated DUI is a "knowing" violation which carries greater moral opprobrium than simple DUI alone. *Id.* at 1195-96.

This logical chain makes little sense. On *Lopez-Meza*'s theory of imputing knowledge, driving without a license under *any* circumstances, drunk or not, would amount to driving while "knowing" that one "should not be driving." There is

term is used in the statute [here at issue] . . . [and] conclude, therefore, that the false statement made by the appellant did not constitute a crime involving moral turpitude.") (internal citation omitted). *Accord Notash v. Gonzales*, 427 F.3d 693, 698 (9th Cir. 2005) (holding that the Immigration Judge erred in "equat[ing] [willfulness] with evil intent. We have stated . . . that the word 'wil[l]ful' means no more than that the forbidden act is done deliberately and with knowledge . . . . [This] does not establish the evil intent required for a crime of moral turpitude.") (internal quotation marks, alterations, and citations omitted).

thus nothing about the mental state involved in aggravated DUI that differentiates it from mere driving on a suspended license — which is not a CIMT. *Lopez-Meza* nevertheless holds that aggravated DUI is a CIMT "because the aggravated circumstances necessary for a conviction under [A.R.S. § 28-1383(A)(1)] establish a culpable mental state adequate to support a finding of moral turpitude." *Lopez-Meza*, 22 I. & N. Dec. at 1195. In other words, according to the BIA, the mental state associated with aggravated DUI is sufficient because the mental state associated with aggravated DUI is sufficient.

The majority in today's case recognizes that *Lopez-Meza*'s "intent" analysis was mistaken in one respect: The intent standard specified in A.R.S. § 28-1383(A)(1) is divisible, and the "should have known" portion — which Arizona courts understand to be a negligence standard — does not articulate a sufficiently culpable mental state to establish moral turpitude. *See* Maj. Op. at 2639 (citing *State v. Hyde*, 921 P.2d 655, 678 (Ariz. 1996)). I agree with the majority on this point.

But the majority considers this error to be harmless, because it believes that, with respect to both Campos's 1997 conviction and his 2002 conviction, judicially noticeable documents establish that Campos did in fact *know* he was prohibited from driving[15] — and it defers to the BIA's holding that

---

[15]I disagree, however, with the majority's assertion that judicially noticeable documents establish that Campos's 1997 conviction was for a "knowing" violation of A.R.S. § 28-1838(A)(1). The majority states that "Campos admitted in [his plea colloquy] that he knew he did not have a valid license." Maj. Op. at 2640-41 n.12. That is true — at his plea colloquy, in response to the question "And, Mr. Campos, did you have a valid driver's license at that time in Arizona?," Campos responded, "I never had one." But driving under the influence while "kn[owing] he did not have a valid license" is not sufficient for a conviction under A.R.S. § 28-1838(A)(1). The Arizona statute instead requires that the defendant knew or should have known that his license to drive was "suspended, canceled, revoked, or refused or while a restriction is placed upon the person's driver's license [as a result of a prior DUI-related offense]." A.R.S. § 28-

knowledge, if not negligence, is a sufficiently culpable mental state to constitute moral turpitude. Maj. Op. at 2643-44. I cannot agree with this conclusion. As I will show, even if we assume that knowledge, as opposed to negligence, has been established by Campos's conviction, the BIA's own jurisprudence forecloses the conclusion that mere knowledge could support a finding of moral turpitude in this context.

Although *Lopez-Meza* provides no discernible reasons of its own for concluding that knowledge is a sufficiently culpable mental state, and despite the principle that "we may not supply a reasoned basis for the agency's action that the agency itself has not given," *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 688 (9th Cir. 2007) (internal quotation marks omitted), the majority here strives mightily to invent a justification for the BIA's holding. It does so by citing a hodgepodge of CIMT cases which it claims demonstrate that "[t]he presence or absence of an element in the statute of conviction requiring a culpable mental state consistently has been critical to the BIA's determination of whether a violation of such statute constitutes a crime involving moral turpitude." Maj. Op. at 2644. That statement, surely, is true, but only by virtue of being contentless. It sidesteps the real question — again, what *is* a sufficiently "culpable mental state?" Crucially, none of the cases the majority cites support the precise proposition advanced in *Lopez-Meza*: that *mere knowledge* is a sufficiently culpable mental state to convert a *regulatory offense* into a CIMT. *See* Maj. Op. at 2644-45 (citing cases).[16] Having reviewed the entire corpus of

1383(A)(1). We cannot infer from the fact of his conviction and his statement in the plea colloquy that Campos *knew* his license was suspended, canceled, revoked, or refused; if anything, the plea colloquy indicates that he did not know that. This point of disagreement does not matter, however, because I would hold that even a knowing violation of the Arizona statute would not constitute a CIMT.

[16]Specifically, the majority begins by quoting language concerning "knowing or intentional conduct" from *Matter of Perez-Contreras*, 20 I.

precedential CIMT decisions issued by the BIA from 1940 to the present, I have found no support for this conclusion.

### 2. Surveying the BIA's case law on "regulatory offenses"

As this Court has consistently explained, CIMTs can be understood as belonging to two basic types: (1) offenses

---

& N. Dec. 615, 618 (B.I.A. 1992), *see* Maj. Op. at 2644, but that language is merely dicta. The assault statute at issue in *Perez-Contreras* lacked a knowledge requirement, *id.* at 619, and so the BIA had no occasion to hold that the offense would have qualified as a CIMT had it required knowledge. In any event, later cases concerning violent crimes confirmed that "knowingly" engaging in prohibited conduct is *not* the test for a finding of moral turpitude. In the violent crimes context, the BIA usually requires more than knowledge — essentially, recklessness plus. *See, e.g., Matter of Fualaau*, 21 I. & N. Dec. 475, 478 (B.I.A. 1996) ("In order for an assault . . . to be deemed a crime involving moral turpitude, the element of a reckless state of mind must be coupled with an offense involving the infliction of serious bodily injury."). *Matter of McNaughton*, 16 I. & N. Dec. 569, 574 (B.I.A. 1978), which the majority cites next, is a fraud case, and is therefore inapposite; a conviction for fraud must require a showing not of knowledge, but of the specific "intent to defraud," in order to constitute a CIMT. *See infra*, note 17. The majority then cites *Matter of R-*, 6 I. & N. Dec. 772, 773-774 (B.I.A. 1955), *Matter of M-*, 2 I. & N. Dec. 721, 723 (B.I.A. 1946), and *Matter of G-*, 1 I &. N. Dec. 403, 404-06 (B.I.A. 1943), *see* Maj. Op. 2645, all of which involve theft offenses, for which the requisite mens rea appears to be the specific intent to deprive another permanently of his property. *See Matter of Jurado-Delgado*, 24 I. & N. Dec. 29, 33-34 (B.I.A. 2006) (conviction for retail theft is a CIMT where the statute "requires proof that the person took merchandise offered for sale by a store without paying for it and with the intention of depriving the store owner of the goods" and where it can be presumed that "the taking is with the intention of retaining the merchandise permanently."); *Matter of Salvail*, 17 I. & N. Dec. 19, 20 (B.I.A. 1979) (possession of stolen property is a CIMT where the statute "specifically requires knowledge of the stolen nature of the goods"). The majority also cites *Matter of Abreu-Semino*, 12 I. & N. Dec. 775, 777 (B.I.A. 1968), and *Matter of P-*, 6 I. & N. Dec. 795, 798 (B.I.A. 1955), for the proposition that "moral turpitude normally inheres in the intent." Maj. Op. at 2644. This statement is unarguably correct, but it says nothing about *what level of intent* is sufficient to establish turpitude in what sorts of cases. Notably, *none* of the cases on which the majority relies involve a regulatory offense — which, as shown below, is the category of offense to which aggravated DUI belongs.

involving "fraud," and (2) offenses involving conduct that is both (a) "inherently base, vile, or depraved" and (b) "contrary to the [accepted] private and social duties man owes to his fellow men or to society in general." *Navarro-Lopez v. Gonzales*, 503 F.3d 1063, 1068 (9th Cir. 2007) (en banc) (Pregerson, J., writing for the majority); *accord Galeana-Mendoza*, 465 F.3d at 1058 (9th Cir. 2006); *Carty v. Ashcroft*, 395 F.3d 1081, 1083 (9th Cir. 2005). The BIA has never rejected this understanding, s*ee Galeana-Mendoza*, 465 F.3d at 1058 n.9, and it has adopted *Navarro-Lopez*'s typology in recent non-precedential decisions.

The BIA looks for different levels of mens rea when considering whether offenses in these two categories are CIMTs. For fraud offenses, the mens rea required to establish moral turpitude is more than mere knowledge of the acts committed; it is the specific intent to defraud.[17] For non-fraud offenses involving "base, vile, or depraved" conduct — an ill-defined group which may be further broken down into the subcategories of violent crimes, theft offenses and other crimes against property, sex offenses, drug offenses, and certain offenses against the government — the BIA appears to require a prescribed degree of intent that varies depending upon which subcategory is at issue. As noted above, today's majority relies on language it finds in a smattering of fraud, theft, and

---

[17]*See, e.g., Matter of Balao*, 20 I. & N. Dec. 440, 443 (B.I.A. 1992) (conviction for the violation of a statute prohibiting the issuing of worthless checks was not categorically a CIMT, because the statute prohibited only "the 'knowing' issuance of bad checks," rather than "expressly requir[ing] intent to defraud as an element of the crime"); *Matter of Serna*, 20 I. & N. Dec. 579 (B.I.A. 1992) (conviction for possession of an altered immigration document with knowledge that it was altered, but without proof of any intent to use it unlawfully, is not a CIMT). *But see Matter of Tejwani*, 24 I. & N. Dec. 97, 98-99 (B.I.A. 2007) (money laundering is a fraud CIMT even without any showing of specific intent, because "[a] person who deliberately takes affirmative steps to conceal or disguise the proceeds of criminal conduct acts in an inherently deceptive manner . . . contrary to accepted moral standards.").

violent crime cases to find *Lopez-Meza*'s holding "reasonable." *See supra,* note 16. In doing so, the majority either misunderstands or ignores the fact that the BIA does not follow a single, generally applicable rule as to "intent" across all subcategories of offenses. (Indeed, one could find support for *any* proposition if one's search pool includes all of the BIA's precedential CIMT opinions over the last seven decades.) The better approach, consequently, is to consider what kind of mental state the BIA has required in cases involving the same *type* of offenses.

*Lopez-Meza* does not assert that the Arizona aggravated DUI statute involves a fraud offense.[18] Rather, it views aggravated DUI as belonging to the second, non-fraud category of offenses *Navarro-Lopez* describes. It holds:

> We find that a person who drives while under the influence, knowing that he or she is absolutely prohibited from driving, commits a crime *so base and so contrary* to the currently accepted *duties that persons owe to one another and to society in general* that it involves moral turpitude.

*Lopez-Meza*, 22 I. & N. Dec. at 1196 (emphases added). This description clearly puts aggravated DUI in the non-fraud cate-

---

[18]Indeed, Campos's offense cannot logically be described as a "fraud" offense, because Campos gave no false information to the motor vehicles authorities to obtain a driver's license — he simply drove without one. In contrast, the BIA's fraud cases normally involve affirmative misrepresentations of material facts made for the purposes of personal gain. *See Matter of P-*, 6 I. & N. Dec. 795, 798 (B.I.A. 1955) (making "false or misleading representations in labeling" in violation of the Food, Drug, and Cosmetic Act is a CIMT); *Matter of M-*, 1 I. & N. Dec. 619 (B.I.A. 1943) (willfully and knowingly making a false statement on a Selective Service questionnaire for the purpose of evading military service, where that statement is material, is a fraud CIMT). *See also Beltran-Tirado v. INS*, 213 F.3d 1179, 1184 (9th Cir. 2000) (making false attestations on an employment verification form I-9 and using a false Social Security number are *mala prohibita* but not *mala in se*, and so are not CIMTs).

gory, which encompasses offenses involving "base, vile, or depraved" conduct in violation of "social duties." *See Navarro-Lopez*, 503 F.3d at 1068.

Generally speaking, offenses in the "base, vile or depraved" category will constitute CIMTs only if the BIA finds that they either inherently involve or specifically require a showing of "evil intent."[19] What constitutes "evil intent," in turn, is offense-specific.

Looking in this light at the crime for which Campos was

---

[19]*See, e.g., Matter of Solon*, 24 I. & N. Dec. 239, 241 (B.I.A. 2007) ("Offenses characterized as 'simple assaults' are generally not considered to be crimes involving moral turpitude. This is so because they require general intent only and may be committed without the evil intent, depraved or vicious motive, or corrupt mind associated with moral turpitude.") (internal citation omitted); *Matter of Khourn*, 21 I. & N. Dec. 1041, 1045-46 (B.I.A. 1997) (possession with the intent to distribute cocaine is a CIMT; the intent to distribute involves "evil intent"); *Matter of B-*, 5 I & N Dec. 538, 540-41 (B.I.A. 1953) (a simple assault committed "knowingly" upon a prison guard involved no evil intent and so was not a CIMT); *Matter of S-C-*, 3 I. & N. Dec. 350, 353 (B.I.A. 1949) (state misprision of felony offense is not a CIMT because "[t]o constitute this offense there must be mere knowledge of the offense, and not [necessarily] an[y] assent or encouragement . . . . A conviction could be had[, therefore,] . . . without evil intent. . . . [S]ince the statute does not require an evil or corrupt intent, it is concluded that the crime is not one involving moral turpitude.") (internal quotation marks and citations omitted); *Matter of J-*, 2 I. & N. Dec. 99, 102 (B.I.A. 1944) ("All crimes violate some laws; all deliberate crimes involve the intent to do so. Congress could not have meant to make the willfulness of the act a test; it added as a condition that it must itself be shamefully immoral."). *See also Fernandez-Ruiz v. Gonzales*, 468 F.3d 1159, 1165-66 (9th Cir. 2006) (discussing the requirement that a crime involve a showing of " 'willfulness' or 'evil intent' " to be classified as a CIMT, as opposed to "general intent" or "reckless[ness]"); *Notash v. Gonzales*, 427 F.3d 693, 698 (9th Cir. 2005) (an act done deliberately and with knowledge does not necessarily involve "evil intent" for CIMT purposes); *Goldeshtein v. INS*, 8 F.3d 645, 648 (9th Cir. 1993) (rejecting the argument that "evil intent exists if a conviction requires proof that a defendant did a forbidden act 'willfully,' " where "willfully" was defined to mean "deliberately and with knowledge.").

convicted, it is apparent that it involves two component unlawful acts: (1) simple DUI, and (2) driving on a suspended license. Simple DUI, as *Lopez-Meza* acknowledges, is indisputably a "regulatory offense," *Lopez-Meza*, 22 I. & N. Dec. at 1194; *accord Matter of Torres-Varela*, 23 I. & N. Dec. 78 (B.I.A. 2001) (en banc), and so lacks any "evil intent" element. Driving without a valid license, too, can only be described as a regulatory offense, for it involves the lack of permission to do something that would otherwise be permissible.[20] My review of the BIA's precedential case law over the past seven decades shows that the BIA consistently declines to characterize purely regulatory offenses as CIMTs. In its own words, the BIA has "many times held that the violation of a regulatory, or licensing, or revenue provision of a statute is not a crime involving moral turpitude." *Abreu-Semino,* 12 I. & N. Dec. at 776. Evil intent simply is not an essential aspect of such a regulatory violation, even if the violation is a knowing one, and so such violations are not CIMTs.

For example, in *Matter of H-*, 1 I. & N. Dec. 394 (B.I.A. 1943), the BIA held that an alien's violation of a federal statute requiring liquor retailers to pay a tax to operate their businesses was not a CIMT:

---

[20]Neither *Lopez-Meza* nor any other precedential BIA decision classifies the offense of driving without a valid license as a "regulatory" (or any other kind of) offense. Nor has the BIA ever considered in a precedential decision whether the possession or use of a falsified driver's license is a CIMT. *But see Montero-Ubri v. INS*, 229 F.3d 319, 321 (1st Cir. 2000) (affirming BIA's non-precedential decision that "using" a falsified driver's license was a CIMT, because the "attempt at deceit is inherent in this act"); *id.* at 320 (stating incorrectly that "[t]he BIA has held [in *Serna*] that use of a fraudulent driver's license is a crime of moral turpitude," when in fact, *Serna* involved a falsified immigration document, not a driver's license, and it held that possession of such documents was not a CIMT); *Zaitona v. INS*, 9 F.3d 432 (6th Cir. 1993) (affirming BIA's non-precedential decision that knowingly using a false name and date of birth to obtain a driver's license was a CIMT).

> The crime consists . . . in merely failing to register, pay a tax, and comply with certain regulations of the Internal Revenue Commissioner . . . . [We know of] [n]o case . . . which holds that the violation of a revenue or licensing statute involves moral turpitude. The fact that the thing may be done, providing a tax is paid to the Government, indicates that the act itself does not involve moral turpitude.

*Id.* at 395 (quoting *United States ex rel. Andreacchi v. Curran*, 38 F.2d 498 (S.D.N.Y. 1926)) (internal quotation marks omitted). The BIA recognized that the respondent had been convicted of "unlawfully *and knowingly* carrying on the business of a retail liquor dealer without having paid the special tax as required." *Id.* at 395-96 (emphasis added). Still, the presence of a "knowing[ ]" scienter requirement did not matter to the BIA's analysis; even a knowing failure to conform to a regulatory requirement, apparently, could not demonstrate a sufficiently culpable state of mind to indicate moral turpitude.

Similarly, in *Matter of G-*, 7 I. & N. Dec. 114 (B.I.A. 1956), the BIA held that a conviction for the "possession and transportation of distilled spirits without tax stamps affixed thereto" in violation of "licensing and regulating provisions of the Internal Revenue Code" was not a CIMT, because the "violation of statutes which merely license or regulate and impose criminal liability without regard to *evil* intent do not involve moral turpitude." *Id.* at 115, 118 (emphasis added). Even a knowing violation of the tax statute, then, would not be enough to transform a regulatory offense into a CIMT. *Accord Matter of J-*, 2 I. & N. Dec. 99, 104 (B.I.A. 1944) (holding that a conviction under a federal statute prohibiting the sale of alcohol to Native Americans was not a CIMT because "[r]egulatory enactments of this nature do not create crimes involving moral turpitude."); *Matter of V-*, 1 I. & N. Dec. 293, 294 (B.I.A. 1942) (holding that a conviction under the federal Narcotic Drugs Import and Export Act of 1909,

which penalized "knowingly importing or participating in the importation of narcotic drugs," was not a CIMT because the Act "is a regulatory act and that the violation of it is therefore not a crime involving moral turpitude"); *Matter of G-*, 1 I. & N. Dec. 59, 62 (B.I.A. 1941) (holding that gambling in violation of New York's gaming law was a regulatory offense and so not a CIMT).

The lack of a sufficiently evil intent also played the decisive role in *Goldeshtein v. INS*, 8 F.3d 645 (9th Cir. 1993), where this Court held that the regulatory offense of "willfully" structuring financial deposits in order to prevent a bank from filing currency reports in violation of federal law is not a CIMT, because "evil intent" — as opposed to willfulness or knowledge that the conduct is unlawful — is not an element of the crime. *Id.* at 648. The BIA recently adopted *Goldeshtein* as its rule nationwide in *Matter of L-V-C-*, 22 I. & N. Dec. 594, 603 (B.I.A. 1999), holding that a violation of the structuring statute involves "no per se morally reprehensible conduct."

In short, in a body of case law riddled with inconsistencies, the rule that regulatory offenses are simply not CIMTs — even if committed "knowingly" — appears to be one of the BIA's more stable principles.

### 3. **Lopez-Meza***'s departure from the BIA's regulatory offense precedents*

*Lopez-Meza* acknowledges that there exists a "general rule" that regulatory offenses do not constitute CIMTs. *Lopez-Meza*, 22 I. & N. Dec. at 1193. But it departs from this rule, reasoning that

> an individual who drives under the influence in violation of . . . [A.R.S.] section 28-1383(A)(1) does so with the knowledge that he or she should not be driving under any circumstances. We find that a person

> who drives while under the influence, knowing that he or she is absolutely prohibited from driving, commits a crime so base and so contrary to the currently accepted duties that persons owe to one another and to society in general that it involves moral turpitude.

*Id.* at 1195-96.

This purported explanation is a non-explanation — an ipse dixit or "because I said so" edict. One can, perhaps, read into the BIA's non-explanation the implication that certain offenses are *so* "base, vile, or depraved" that an evil intent, even if not an explicit requirement for conviction under the statute, is inherent in the act. But the BIA has never given any particularized content to the phrase "base, vile, or depraved" other than to hold that some offenses *are* and others are *not*. This is why, as the majority explains, we do not defer to the BIA's use of general descriptive phrases like "base, vile, or depraved, [and] contrary to . . . the duties owed between man and man" — because deferring to a contentless phrase would "ha[ve] no practical significance." *See* Maj. Op. at 2634-35 (quoting *Galeana-Mendoza*, 465 F.3d at 1058 n.9).

Similarly, *Lopez-Meza*'s purported explanation provides no way to figure out when (or by what logic) an offense is *sufficiently* "base, vile, and depraved" that evil intent is implicit in the act.[21] What we do know is that the BIA and this Court

---

[21] The answer to this question cannot depend upon the seriousness of the breach or the severity of the harm caused, for the BIA has held that neither factor can compensate for the lack of mens rea otherwise required to transform an offense into a CIMT. *See Abreu-Semino*, 12 I. & N. Dec. at 777 (holding, in the drug possession context, that "crimes in which evil intent is not an element, no matter how serious the act or harmful the consequences, do not involve moral turpitude."); *Matter of Solon*, 24 I. & N. Dec. 239, 242 (B.I.A. 2007) (explaining, in the context of assault crimes, that "as the level of conscious behavior decreases, i.e., from intentional to reckless conduct, more serious resulting harm is required in order to find that the crime involves moral turpitude. [But] where no conscious behavior is required, there can be no finding of moral turpitude, regardless of the resulting harm.").

have in practice limited the concept of "implicitly evil intent" to fraud,[22] sex offenses,[23] and drug trafficking offenses.[24] *Lopez-Meza* provides no reasons why a regulatory DUI offense belongs in the same camp.

---

[22]*See Matter of Flores*, 17 I. & N. Dec. 225, 230 (B.I.A. 1980) ("[T]he crime of uttering or selling false or counterfeit paper relating to registry of aliens with knowledge of their counterfeit nature inherently involves a deliberate deception of the government and an impairment of its lawful functions. Thus, fraudulent conduct is implicit in the statute."); *accord Notash v. Gonzales*, 427 F.3d 693, 698 (9th Cir. 2005) ("[E]ven if intent to defraud is not explicit in the statutory definition, a [fraud] crime nevertheless may involve moral turpitude if such intent is implicit in the nature of the crime.") (internal citations, quotation marks, and alterations omitted).

[23]*See Matter of Dingena*, 11 I. & N. Dec. 723, 727-28 (B.I.A. 1966) (holding that statutory rape is a CIMT, despite the lack of a scienter requirement); *but see Quintero-Salazar v. Keisler*, 506 F.3d 688, 692 (9th Cir. 2007) (holding that statutory rape under Cal. Penal Code § 261.5(d) is not categorically a CIMT). *See also Matter of Tobar-Lobo*, 24 I. & N. Dec. 143, 146-47 (B.I.A. 2007) (holding that a convicted sex offender's failure to register in violation of Cal. Penal Code § 290(g)(1) was a CIMT, even if the failure was purely inadvertent, because the failure to abide by the registration requirement is so base and depraved that evil intent is inherent in the act). Although *Tobar-Lobo* involved a regulatory registration requirement, it is best understood as a sex-related offense case, not a regulatory offense case, as it was evidently the underlying sex offense and not the failure to register that the BIA found "reprehensible." *See Plasencia-Ayala v. Mukasey*, 516 F.3d 738, 748-49 (9th Cir. 2008). At any rate, *Tobar-Lobo* has been superseded in this Circuit by *Plasencia-Ayala. See id.* at 746-49 (holding that failure to register as a sex offender under Nev. Rev. Stat. § 179D.550 is not a CIMT, because the statute is "regulatory . . . in nature" and "lacks the requisite element of willfulness or evil intent"). Most recently, the Attorney General held that "convictions obtained under statutes that limit convictions to defendants who knew, or reasonably should have known, that their intentional sexual acts were directed at children categorically should be treated as convictions for crimes involving moral turpitude." *Silva-Trevino*, 24 I. & N. Dec. at 707.

[24]*See Matter of Khourn*, 21 I. & N. Dec. at 1047 ("an evil intent is inherent in the crime of distribution of a controlled substance under 21 U.S.C. § 841(a)(1).").

Indeed, to the extent *Lopez-Meza* can be read to hold that drunk driving on a suspended license is so base, vile, or depraved that evil intent is somehow inherent in the act, I can find no reasons in the BIA's precedential CIMT cases — or in logic — why that should be so. Certainly, where a non-fraud offense is purely regulatory, it cannot "inherently" exhibit an evil intent. After all, that is the very definition of a crime that is *malum prohibitum*: But for the statutory prohibition, the act would not be wrongful.[25] If any aspect of Campos's conduct could be characterized as morally wrongful, it would be driving while intoxicated — not driving on a suspended license. But the BIA has unequivocally acknowledged that driving while intoxicated is *not* turpitudinous, *see Lopez-Meza*, 22 I. & N. Dec. at 1194,[26] and so, necessarily, does not inherently demonstrate an evil state of mind.

In fact, the BIA has held that even a *third* conviction for drunk driving — another variety of "aggravated" DUI under the same Arizona statute at issue here — is not a CIMT. *Matter of Torres-Varela,* 23 I. & N. Dec. 78 (B.I.A. 2001) (en banc).[27] As Judge Nelson cogently argued in her dissent from

---

[25]*See* COOLEY'S BLACKSTONE, Vol. I at 54, 58 (4th ed.) (describing crimes *mala in se* as crimes "such as murder, theft, and perjury: which contract no additional turpitude from being declared unlawful by the inferior legislature," whereas crimes *mala prohibita* "enjoin only positive duties, and forbid only such things as are not *mala in se* . . . without any intermixture of moral guilt.").

[26]*Accord Knapik v. Ashcroft*, 384 F.3d 84, 90 (3d Cir. 2004) (noting that drunk driving "almost certainly does not involve moral turpitude"); *Murillo-Salmeron v. INS*, 327 F.3d 898, 902 (9th Cir. 2003) ("[S]imple DUI convictions . . . are not crimes of moral turpitude."); *Franklin v. INS*, 72 F.3d 571, 590 n. 17 (8th Cir. 1995) (recognizing that the "violation of regulatory laws such as . . . drunk driving" does not involve moral turpitude).

[27]*Torres-Varela* involved A.R.S. § 28-697(A)(2), which has since been redesignated as A.R.S. § 28-1383(A)(2) — and which is the neighboring subsection to A.R.S. § 28-1383(A)(1), formerly A.R.S. § 28-697(A)(1), the provision at issue here. *See* Maj. Op. at 2626 n.1. Both subsections are categorized as "aggravated driving" offenses.

the panel decision in this case, "it is patently unreasonable to conclude that driving under the influence only once, even with a suspended license, somehow carries with it greater moral opprobrium than driving drunk repeatedly." *Marmolejo-Campos v. Gonzales*, 503 F.3d 922, 929 (9th Cir. 2007) (D. Nelson, J., dissenting).

*Lopez-Meza*'s implicit suggestion that the lack of a valid license converts a simple DUI offense, which does not inherently involve an evil intent, into a CIMT that does necessarily involve an evil intent, is simply incoherent. The BIA has identified no basis whatever for treating this variety of aggravated DUI under A.R.S. § 28-1383(A)(1) differently from other regulatory offenses which have been designated as non-turpitudinous. "Because I said so" is not good enough.

## B.    The BIA's rule against combining two non-CIMT offenses into a CIMT

In addition, treating aggravated DUI under A.R.S. § 28-1383(A)(1) as a CIMT runs squarely into a second set of BIA precedents: those cases holding that two crimes that are not themselves CIMTs cannot, when committed together, morph into a CIMT.

As I have already noted, simple DUI is not a CIMT. *See Lopez-Meza*, 22 I. & N. Dec. at 1194. The act of driving without a valid license is not a CIMT either. If evil intent does not inhere in either of the component offenses that make up A.R.S. § 28-1383(A)(1) individually, then such intent could only be found, if anywhere, in the synergy between those two component offenses when they are committed simultaneously. This appears to be where *Lopez-Meza* ultimately locates it — in bald defiance of the rule it set out in *Matter of Short*, 20 I. & N. Dec. 136 (B.I.A. 1989).

In *Matter of Short,* the BIA held that assault with intent to commit a felony is not per se a CIMT. Rather, the assault will

only fall within the CIMT category if the felony that the perpetrator intended to commit would itself have been so designated. *Short* explained:

> [I]f a simple assault does not involve moral turpitude and the felony intended as a result of that assault also does not involve moral turpitude, then the two crimes combined do not involve moral turpitude. Moral turpitude cannot be viewed to arise from some undefined synergism by which two offenses are combined to create a crime involving moral turpitude, where each crime individually does not involve moral turpitude. There must be some particular criminal activity with which to evaluate whether the nature of that activity involves moral turpitude.

*Id.* at 139. In other words, evil intent cannot float about in the ether; it must be grounded in one act or another.

The rule of *Short* coheres with the BIA's longstanding insistence that it is the *nature* of the offense that matters when deciding whether the offense is morally turpitudinous, not the circumstances under which the offense occurred or how frequently it has happened. *See, e.g., Goldeshtein*, 8 F.3d at 649; *accord L-V-C-*, 22 I. & N. Dec. at 603. Consistent with the rule that the requisite evil intent must inhere in the crime of conviction, the BIA will impute the intent associated with crime A to crime B only if crime B is done with the *purpose* of committing crime A.

For example, burglary offenses "may or may not involve moral turpitude, the determinative factor being whether the crime intended to be committed at the time of entry . . . involves moral turpitude." *Matter of M-*, 2 I. & N. Dec. 721, 723 (B.I.A. 1946). Likewise, malicious trespass, which is not a CIMT by itself, becomes one when the trespass is committed with the intent to commit larceny, which would itself be

a CIMT. *Matter of Esfandiary*, 16 I. & N. Dec. 659, 661 (B.I.A. 1979). *Short* is a reiteration of this general rule.

*Lopez-Meza* runs directly into this line of case law by suggesting that the regulatory offense of driving without a license and the regulatory offense of simple DUI, neither of which (even if committed "knowingly") involves moral turpitude, somehow exhibit moral turpitude when committed at the same time. But the simultaneity of offenses, without more, has never been enough to create moral turpitude out of nothing. As *Short* held, "[t]here must be some particular criminal activity" in which moral turpitude inheres, 20 I. & N. Dec. at 139, or else some purposeful link between an attempted CIMT offense and the perfected non-CIMT offense that justifies imputing the mental state associated with the former to the latter. *Matter of M-*, 2 I. & N. Dec. at 723; *Matter of Esfandiary*, 16 I. & N. Dec. at 661. Turpitude cannot arise simply out of the "synergism" between two non-turpitudinous offenses, even if committed simultaneously. *Matter of Short*, 20 I. & N. Dec. at 139. Yet that is precisely what *Lopez-Meza* does.

*Lopez-Meza* does lamely attempt to distinguish itself from *Short*. First, it notes that

> [t]he relevant discussion in *Matter of Short* . . . pertained to a simple assault with intent to commit a felony of unproven seriousness. We did not hold in that decision that a combination of acts that are included as elements of a specific offense could never, when added together, build to such a heightened deviance from accepted moral standards as to reach a level of conduct deemed morally turpitudinous. In fact, additional aggravating elements can often transform an offense that otherwise would not be a crime involving moral turpitude into one that is.

*Lopez-Meza*, 22 I. & N. Dec. at 1196. Tellingly, the BIA cites *no* authority for its proposition that aggravating elements not themselves demonstrative of evil intent "often" have transformed non-CIMTs into CIMTs.[28]

*Lopez-Meza* then goes on to explain:

> The finding of moral turpitude in the crimes in the present case does not arise simply from an amalgamation of distinct separate offenses; rather, it results from a building together of elements by which the criminalized conduct deviates further and further from the private and social duties that persons owe to one another and to society in general. . . . [W]hen [simple DUI] is committed by an individual who knows that he or she is prohibited from driving, the offense becomes such a deviance from the accepted rules of contemporary morality that it amounts to a crime involving moral turpitude.

*Id.* But nowhere does the BIA attempt to explain *by what*

---

[28]This statement would be supportable, although only qualifiedly so, in the assault context. In assault cases, certain "aggravating factors," like the use of a deadly weapon, may be sufficient to establish turpitude where simple assault by itself would not. *See Matter of Fualaau*, 21 I. & N. Dec. at 478; *Matter of Sanudo*, 23 I. & N. Dec. at 971. The BIA's case law in this area is particularly confused, probably because the term "assault" encompasses such a wide range of state crimes. Moreover, I have found *no* cases in which an aggravating factor converts a *regulatory* offense to a CIMT; nor does the BIA in *Lopez-Meza* provide any reason why the approach used in its assault cases should be imported to the regulatory offense context when it has not been imported into other contexts. Indeed, the BIA established in *Torres-Varela* that another "aggravating factor" listed under the same Arizona statute at issue here — that is, recidivist DUI, A.R.S. § 28-1383(A)(2) — is not enough to establish moral turpitude. *Torres-Varela*, 23 I. & N. Dec. at 85-86. And as shown above, in Section II.A, the bulk of the BIA's case law on regulatory offenses holds that *no* mental state can establish sufficient culpability to transform a regulatory offense into a CIMT.

*logic* simple DUI, when committed simultaneously with unlicensed driving, "becomes such a deviance" from moral standards that moral turpitude materializes where there was none before. The BIA claims that this is not the "amalgamation of distinct separate offenses" but the "building together of elements by which the criminalized conduct deviates further and further" from accepted moral standards — but what is "amalgamation," if not a "building together?" Again, *Lopez-Meza* offers no clue.

Encountering a similarly flimsy explanation in *Bush-Quayle '92 Primary Comm. v. FEC*, 104 F.3d 448, 454 (D.C. Cir. 1997), the D.C. Circuit lamented that "[w]ithout adequate elucidation, this court has no way of ascertaining whether cases are indeed distinguishable, whether the [agency] has a principled reason for distinguishing them, or whether the [agency] is refusing to treat like cases alike." So here. *Lopez-Meza*'s explanation of how it differs from *Short* amounts to "because I said so," yet the majority considers this a "reasoned explanation" worthy of *Chevron* deference. Maj. Op. at 2646. The majority explains its position by noting that *Lopez-Meza*, even if "inconsistent" with *Short*, "does not leave us 'in doubt as to the reason for the change in direction.' " *Id.* at 2647-48 n.15 (quoting *Morales-Izquierdo v. Gonzales*, 486 F.3d 484, 493 (9th Cir. 2007) (en banc)); *see also* Maj. Op. at 2645-46. I cannot agree. Unless we understand that new direction to be "any way the Board wants," *Lopez-Meza* provides no explanation for the change in direction, and thus no guidance on how to apply *Short*'s rule to future cases.

As I see *Lopez-Meza*, "the [Board] has changed its view of the [continued validity or scope of *Short*] without explaining what its new interpretation is." *Cross-Sound Ferry Servs., Inc. v. ICC*, 873 F.2d 395, 398 (D.C. Cir. 1989). That "is not a permissible exercise of the [Board's] power under *Chevron*," *id.*, and it certainly is not a decision to which this Court should defer.

### C. Summary: *Lopez-Meza* as an Unreasonable Interpretation of the INA

In sum, the BIA offers no reasoned explanation in *Lopez-Meza* for its deviations from two modest, relatively consistent principles floating in the miasma that is the BIA's CIMT jurisprudence. We have no "explanation" worthy of the name for why knowledge, rather than evil intent, should be sufficient to transform a regulatory offense into a CIMT. And we have no "explanation" worthy of the name for why the principle that aggregating two non-CIMT offenses cannot yield a CIMT offense, which was enunciated definitively in *Matter of Short*, does not apply here. Even within an exceptionally tangled field of confused and conflicting case law, *Lopez-Meza* stands apart, ignoring what few guideposts the BIA has staked out.

I note that the BIA's own regulations require that, "through precedent decisions, [the Board] shall provide clear and uniform guidance to the Service, the immigration judges, and the general public on the proper interpretation and administration of the Act and its implementing regulations." 8 C.F.R. § 1003.1(d)(1). Yet, the BIA's CIMT precedents are anything *but* "clear and uniform," as I hope I have demonstrated.

The BIA's refusal to abide by its regulatory mandate to provide clear and uniform guidance leaves individual aliens uncertain as to what conduct will put them at risk of deportation — a "drastic sanction," as we noted in *American-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 n.4 (9th Cir. 1991) (quoting *Gastelum-Quinones v. Kennedy*, 374 U.S. 469, 479 (1963)). The Supreme Court in *Smiley* specifically provided that an agency's indifference to "legitimate reliance on prior interpretation[s]" could make that agency's new position ineligible for *Chevron* deference. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996) (internal citations and quotation marks omitted); *see also Billeke-Tolosa v. Ashcroft*, 385 F.3d 708, 711 (6th Cir. 2004)

("The consistent application of [the BIA's] precedents, like the consistent application of [an agency's] regulations, serves a critical purpose: the provision of fair notice to those subject to the agency's decisions.").[29] The BIA's failure to abide by its own CIMT precedents, in defiance of its duty under 8 C.F.R. § 1003.1(d)(1) to "provide clear and uniform guidance to . . . the general public," casually ignores those reliance interests.

Moreover, the BIA's refusal to provide "clear and uniform guidance" makes our task as a reviewing court immeasurably harder. Without any overarching theory to guide the BIA's application of the term "crime involving moral turpitude," how can a court review the Board's determination that a particular offense falls on one side or another of that nonexistent line? Without any stable theory about what role intent plays in defining moral turpitude, how can a court tell whether a particular decision is "consistent" or "inconsistent" with the agency's past positions, and, thus, whether it is reasonable under *Chevron*? *See Nicanor-Romero v. Mukasey*, 523 F.3d 992, 997 (9th Cir. 2008) (noting that "the BIA has provided little concrete guidance" as to the meaning of moral turpitude); *Mei v. Ashcroft*, 393 F3d 737, 739 (7th Cir. 2004) ("Since Congress did not define 'crime involving moral turpitude' . . . it is reasonable to suppose à la *Chevron* that Congress contemplated that the agency charged with administering the statute would define the term, and specifically would tailor the definition to the policies embodied in the immigration statutes. The Board of Immigration Appeals has done neither."). To nonetheless defer to *Lopez-Meza*, as the majority does today, is to acquiesce in the BIA's flouting

---

[29]*See also* William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from* Chevron *to* Hamdan, 96 Geo. L. J. 1083, 1151 (2008) ("An agency interpretation that departs from a previously established agency understanding is more likely to be *arbitrary* in several senses: compared with a longstanding interpretation, a new construction is more likely to unsettle reliance interests . . . .") (emphasis in original).

of its interpretive duty and surrender to its continued frustration of effective judicial review.

I would hold that the BIA's determination in Campos's case — that, based on *Lopez-Meza*, Campos's two aggravated DUI convictions are CIMTs — is not supported by a reasoned explanation, and would remand to the agency. I therefore respectfully dissent.